[No. 12510. Department Two. November 5, 1915.]

JAY P. GRAVES, *Respondent*, v. F. G. DUNLAP *et al.*,
*Appellants.*[1]

ANIMALS—GAME—WILD ANIMALS—PROPERTY RIGHTS — CONSTITU-
TIONAL LAW—DUE PROCESS. There is a property right in animals
*ferae naturae*, such as deer, game birds, and domesticated swan, of
which the owner cannot be deprived by an act of the legislature
without due compensation, as guaranteed by the state constitution,
art. 1, § 3, and the fourteenth amendment of the Federal constitu-
tion, where they have been reclaimed from their wild state and are
kept confined in inclosures and cared for as domestic animals or
fowls.

GAME—STATUTES—RETROACTIVE OPERATION—CONSTITUTIONAL LAW
—DUE PROCESS. 3 Rem. & Bal. Code, § 5395-21, providing that no
person shall have any property right in any of the wild animals pro-
tected by the game code of 1913, but that they shall always remain
the property of the state, and § 5395-33, providing that no person
shall "have in possession or under control" any of such wild ani-
mals, should not be given a retroactive effect, when to do so would
violate the due process clauses of the state and Federal constitu-
tions protecting the qualified right of property in animals *ferae
naturae* that had been reclaimed from their wild state before the
passage of the act.

GAME—PROTECTION—STATUTES—"POSSESS." Under the game laws
of the state as they existed from 1901 to 1911, inclusive, regulating
the hunting of game, taking the word "possess" in connection with
its context, wherein it is prohibited to "hunt, pursue, take, kill, in-
jure, destroy or possess" any of the protected animals during the
closed season prescribed in the act, it must have been the intention
of the legislature to prohibit the taking of "possession" only during
the closed season; and there is nothing in any of the acts sufficiently
broad to cover the possession of deer and game fowls which were re-
claimed from their wild state and kept in an inclosure.

ANIMALS—GAME—WILD ANIMALS—PROPERTY RIGHTS — RIGHT TO
KILL. A person having a property right in reclaimed wild animals
may kill one or more of them, without offending against the game
laws, where it becomes necessary to do so in the care and manage-
ment of the herd or as a humane act.

SAME—RIGHT TO DISPOSE OF—CONSTITUTIONAL LAW—PROTECTION,
OF GAME—POLICE POWERS. A person having a property right in re-

[1] Reported in 152 Pac. 532.

claimed wild fowls kept in inclosures or domesticated, has no right to "dispose of them as he sees fit," where that would seriously interfere with the enforcement of the game laws; since the state may prohibit the sale of protected game animals, in the exercise of its police powers, in order to protect them during the closed season.

APPEAL—REVIEW—MOOT QUESTION. That an erroneous provision in a judgment allowing respondent to dispose of his game birds in "any manner he saw fit" would never be taken advantage of by respondent, who did not intend to dispose of them, does not make the question of error a moot question; and the same will be determined on appeal from the judgment.

Appeal from a judgment of the superior court for Spokane county, Webster, J., entered May 15, 1914, in favor of the plaintiff, in an action for an injunction, tried to the court. Modified.

*John M. Gleeson*, for appellants.

*Graves, Kizer & Graves*, for respondent.

MAIN, J.—The purpose of this action was to establish the plaintiff's ownership and right to possession of certain game animals and birds, and to restrain the defendants, the game warden, and the prosecuting attorney of Spokane county, from interfering with, or disturbing the plaintiff's ownership and right to the possession of, the animals and birds in question. After the issues were framed, the cause was tried to the court sitting without a jury, and resulted in a judgment sustaining the plaintiff's right to ownership and possession, and restraining the defendants from beginning or prosecuting any criminal action against the plaintiff on account of his possession of the wild animals and birds referred to. From this judgment, the defendants appeal.

The facts are not in dispute, and are, in substance, as follows: The plaintiff, during the year 1901, and prior thereto, and at the present time, owns a farm consisting of several hundred acres of land, a few miles north of the city of Spokane. Upon this farm there has been kept a herd of dairy cattle. During the winter of 1901, a doe with a broken leg

came into the herd of cattle upon the farm. This doe, by the respondent, or by the employees upon his farm, was placed in a box stall in the barn and taken care of until she recovered, when she was put into an enclosure. The following season a buck was given to the respondent by one of the men employed by him. To these deer and their increase the respondent occasionally added from outside herds. Because inbreeding causes a herd to deteriorate, on several occasions bucks were exchanged from the herd for bucks in city parks of Spokane and Tacoma.

During the early years of the herd and on two occasions, does from without the state were given to the respondent by friends. The doe and buck first acquired are still living. These, with the increase, and such bucks as have been procured by exchange, and their increase, made up a herd of about twenty deer in the fall of the year 1913. This herd is kept on the respondent's farm in an enclosure containing fifteen or twenty acres, which is surrounded by a high woven wire fence to which entry can only be gained by gates. During the summer there is sufficient feed in the enclosure to sustain the deer, but in the winter it is necessary to feed them. Workmen on the farm look after them all the year round, and give them the attention that is given to cattle and other animals. The deer are not permitted to be without the enclosure.

The respondent also has certain fowls, including swans, wood ducks, pheasants, etc. Eight of the swans are birds obtained in the year 1902, with their increase. Four of the swans were purchased in the state of Massachusetts for breeding purposes, in the year 1913. These swans have their nesting places around the lakes on the farm, and are fed and taken care of as purely domestic fowls. The remainder of the fowls are kept in enclosed or covered runways in the respondent's poultry yards. These were purchased in various parts of the United States and Canada. For one pair of Reeves pheasants, $85 was paid. For one pair of Amherst

·pheasants, about $100 was paid. The fowls are not used for food nor killed, and none have been sold, though the respondent has given away one or two pairs of pheasants for breeding purposes.

The appellants claim that the respondent has no right to keep the deer and the fowls in the enclosure, and that both the deer and the fowls are subject to the same regulation by the legislature as is the wild game of the state. The respondent claims that he has a property right in the deer and the fowls, and that therefore it cannot be taken away by act of the legislature without due compensation being first made. The question, therefore, is, whether the respondent had acquired a property right in the deer and birds which he was entitled to have protected.

Animals *ferae naturae* are known by the denomination of game. 1 Cooley, Blackstone (4th ed.), p. 758. The respondent's deer and fowls come within the term game, unless, by the fact of their reclamation and confinement, there has been acquired a property right therein which is not recognized in wild game. Without reviewing the early common law upon the subject of game, it may be said that the recognized doctrine is that the title to game belongs to the state in its sovereign capacity, and that the state holds this title in trust for the use and benefit of the people of the state. The state, through its legislature, has the right to control for the common good the killing, taking and use of game, so long as the rights guaranteed either by the state or Federal constitution are not encroached upon. In *Cawsey v. Brickey*, 82 Wash. 653, 144 Pac. 938, it was said:

"Under the common law of England all property right in animals *ferae naturae* was in the sovereign for the use and benefit of the people. The killing, taking and use of game was subject to absolute governmental control for the common good. This absolute power to control and regulate was vested in the colonial governments as a part of the common law. It passed with the title to game to the several states as an incident of their sovereignty and was retained by the

states for the use and benefit of the people of the states, subject only to any applicable provisions of the Federal constitution."

See, also, *Geer v. Connecticut*, 161 U. S. 519. Many other decisions to the same effect might be cited; but the multiplication of authorities upon this question is hardly necessary.

While animals *ferae naturae* belong to the state, as indicated, yet, when they are reclaimed by the art and power of man, they are the subject of property, and a property right thereto may be acquired. In 2 Cooley, Torts (3d ed.), p. 838, the author says:

"There is no property in wild animals until they have been subjected to the control of man. If one secures and tames them, they are his property; if he does not tame them, they are still his so long as they are kept confined and under his control."

In 2 Kent, Commentaries (14th ed.), p. *348, upon the same question, the author observes:

"Animals *ferae naturae*, so long as they are reclaimed by the art and power of man, are also the subject of a qualified property; but when they are abandoned, or escape, and return to their natural liberty and ferocity, without the *animus revertendi*, the property in them ceases. While this qualified property continues, it is as much under protection of law as any other property, and every invasion of it is redressed in the same manner."

See, also, to the same effect. 1 Cooley, Blackstone (4th ed.), p. 743.

It will be noticed from the excerpt quoted from Kent that the author uses the term "qualified property." Many of the decisions which discuss the question use the same term. The appellants contend that, since the property right is a qualified one, the state, in the exercise of its police power, can take it away with impunity. But the qualified property referred to is a property right which is defeasible upon a condition subsequent which may or may not happen. This con-

dition is that, if the animals return to their wild state, the property right ceases. That the property right is a defeasible one is recognized by Blackstone. In 1 Cooley, Blackstone (4th ed.), p. 744, referring to this subject it is said:

"In all these creatures, reclaimed from the wilderness of their nature, the property is not absolute but defeasible: a property that may be destroyed if they resume their ancient wildness and are found at large. For if the pheasants escape from the mew, or the fishes from the trunk, and are seen wandering at large in their proper element, they become *ferae naturae* again; and are free and open to the first occupant that hath ability to seize them. But while they thus continue my qualified or defeasible property, they are as much under the protection of the law, as if they were absolutely and indefeasibly mine; and an action will lie against any man that detains them from me, or unlawfully destroys them."

Animals *ferae naturae*, if reclaimed and kept in enclosed ground, are property which will pass to the executors and administrators of a deceased person. In *Dieterich v. Fargo*, 194 N. Y. 359, 87 N. E. 518, 22 L. R. A. (N. S.) 696, quoting with approval from 1 Halsbury's Laws of England, § 799, it was said:

"Deer, though strictly speaking *ferae naturae*, if reclaimed and kept in inclosed ground, are the subject of property, pass to the executors and are liable to be taken in distress."

Animals *ferae naturae* are also, while they are reclaimed, the subject of larceny. In *State v. Shaw*, 67 Ohio St. 157, 65 N. E. 875, 60 L. R. A. 481, it is said:

"To acquire a property right in animals *ferae naturae*, the pursuer must bring them into his power and control and so maintain his control as to show that he does not intend to abandon them again to the world at large. When he has confined them within his own private enclosure where he may subject them to his own use at his pleasure, and maintains reasonable precautions to prevent escape, they are so impressed with his proprietorship that a felonious taking of them from his enclosure, whether trap, cage, park, net, or whatever it may be, will be larceny."

It would seem that if wild animals when reclaimed will pass to the executors or administrators of a deceased person, or may be the subject of larceny, that the possessor of such animals would have such a right or title thereto that it could not be taken away without due compensation first made. If such property right can be taken away by the act of the legislature, then it does not have the same protection of the law as any other property, which both Kent and Blackstone say it is entitled to.

The appellant cites the case of *Cawsey v. Brickey*, 82 Wash. 653, 144 Pac. 938, as sustaining his contention that the respondent had only a qualified property in the deer and fowls, and that such a property right could be destroyed by the legislature at any time. In that case, the court was considering the status of game which had not been reclaimed. The question whether the legislature had the power to destroy the property right which exists in reclaimed game animals was not before the court and was not considered in the opinion.

At the legislative session for the year 1913, there was passed what is known as the game code, Laws of 1913, ch. 120, p. 356 (3 Rem. & Bal. Code, § 5395-1 *et seq.*). Section 21 (3 Id., § 5395-21) of this code provides, that no person shall at any time or in any manner acquire any property in, or subject to his dominion or control, any of the game birds, game animals or game fish mentioned in the act, but that such game animals, fish and birds shall always and under all circumstances remain the property of the state.

Section 33 provides:

"No person shall, within the state of Washington, hunt, catch, take, kill, ship, convey or cause to be shipped or transported by common or private carrier, to any person, either within or without the state, purchase, expose for sale, have in possession with intent to sell, sell to any person or have in possession or under control at any time, any elk, moose, caribou, deer, fawn, mountain sheep or mountain goat,

or any part thereof, including the hides, horns or hoofs except as herein provided." 3 Id., § 5395-33.

It will be noticed that this statute provides that no person shall "have in possession or under control at any time" any of the wild animals therein mentioned. It was under this statute that the appellants claimed that the respondent was unlawfully confining the deer and fowls mentioned. It may well be doubted whether, when all of the provisions of the act are considered, that it was intended by the legislature that it should be retroactive in the sense that it should cover game animals and birds reclaimed prior to its passage, and confined as were those of the respondent. It is a rule of construction that a statute will not be given a retroactive effect unless by its terms it is shown clearly that that was the legislative intent. *State ex rel. American Sav. Union v. Whittlesey*, 17 Wash. 447, 50 Pac. 119; *Rogers v. Trumbull*, 32 Wash. 211, 73 Pac. 381; *Fowler v. Fairchild*, 3 Wash. 747, 29 Pac. 351. But if the statute were to be given a retroactive construction, it is plain that the respondent had acquired such a property right in the deer and fowls that it could not be taken away without due process of law, as provided in article 1, § 3 of the constitution of this state, and the fourteenth amendment to the Federal constitution.

But the appellants contend that, under the statutes of this state as they existed in 1901, and subsequent thereto, the respondent's possession of the deer and fowls has been at all times wrongful, and that therefore he could acquire no property right therein. By the Laws of 1897, p. 82, it was made unlawful for any person at a specified season of the year to "hunt, pursue, take, kill, injure or destroy any deer." By the Laws of 1899, p. 277, the same language is used in the legislative enactment passed at that session. By the Laws of 1901, p. 279, while the number of deer that may be killed is limited, the language of the previous statutes relative to hunting, killing, etc., is not amended. By the Laws of 1903, it was made unlawful for any person within the

state of Washington, at any time between the 15th day of December and the 15th day of September of the following year, to "hunt, pursue, take, kill, injure, destroy, or possess any deer" (Laws of 1903, p. 94, ch. 71, § 1). In this statute the term "possess" appears for the first time. By the Laws of 1905, p. 277, ch. 147, provision is made for licenses, but otherwise the language of the previous statute does not seem to be altered. By the Laws of 1911, p. 396, it is made unlawful for any person, within a specified portion of the year, to "hunt, pursue, take, kill, injure, destroy, or possess any deer." In these statutes we find nothing which would make the possession of game, such as that exercised by the respondent, unlawful. It is true that both the Laws of 1903 and 1911 use the term "possess." But reading this term in connection with the context, it is plain that the legislature meant to take possession during the prohibited season. In addition to this, the respondent's herd of deer had its foundation some two years previous to the passage of the law of 1903. There can be no question that in none of the laws passed prior to the year 1913 were the terms used sufficiently broad to cover the possession of deer which were reclaimed and kept in an enclosure.

The appellants also complain of certain provisions of the judgment. This judgment provides that the respondent is not entitled to kill the deer, or any of them, during the closed season, except that should any deer become wounded or crippled and it should become necessary to kill it. on that account, that this might be done; or if it should become necessary in the care and management of the herd of domesticated animals to kill one or more of them, this might be done. We do not think the decree went too far in this regard. To kill an animal wounded or crippled in a fight, many times becomes a humane act. And since the respondent has a property right in the animals, if necessary in the care and management of the herd, to kill, he may do so without offending the law.

The portion of the judgment relating to fowls, after providing that the respondent shall have the same ownership and right to possession thereof as he is given to the deer, concludes: "And to dispose of them in such manner as he sees fit." The provision of the decree which gives the right to the respondent to dispose of the fowls in such manner as he sees fit is too broad. Acting thereunder the respondent would have the right to kill and sell such fowls during the closed season. If this may be done it would seriously interfere with the enforcement of the game laws of the state, because of the difficulty of determining whether a fowl killed and possessed during the closed season had been a reclaimed or wild bird. For the protection of the game birds of the state, the state has the power to prohibit the killing and disposing of reclaimed game during the closed season. In *New York ex rel. Silz v. Hesterberg*, 211 U. S. 31, the relator, August Silz, a dealer in imported game, had been arrested and convicted for having in his possession, in the city of New York, one imported golden plover which had been lawfully taken, killed and captured in England during the open season for such game birds there, and thereafter sold and consigned to Silz in the city of New York by a dealer in game in the city of London. He likewise had in his possession the body of one black cock, a member of the grouse family, which was lawfully taken, killed and captured in Russia during the open season for such game there, and thereafter sold and consigned to Silz in New York city by the same dealer in London. Such birds were imported by Silz in accordance with the tariff laws of the United States, during the open season for grouse and plover in New York. At the time Silz was arrested under the statutory law of New York, it was unlawful for him to have in his possession birds or fowl of the kind mentioned. The supreme court of the United States sustained the law and the conviction of Silz thereunder. In the course of the opinion, it was said:

"In order to protect local game during the closed season it has been found expedient to make possession of all such game during that time, whether taken within or without the state, a misdemeanor. In other states of the Union such laws have been deemed essential, and have been sustained by the courts. [Citing authorities.] It has been provided that the possession of certain kinds of game during the closed season shall be prohibited, owing to the possibility that dealers in game may sell birds of the domestic kind under the claim that they were taken in another state or country. The object of such laws is not to affect the legality of the taking of game in other states, but to protect the local game in the interest of the food supply of the people of the state. We cannot say that such purpose, frequently recognized and acted upon, is an abuse of the police power of the state, and as such to be declared void because contrary to the Fourteenth Amendment of the Constitution."

The respondent claims that, since the plaintiff testified upon the trial that he had never killed any of his birds and never expected to, that the question whether or not he would have a right to kill and dispose of the birds under the decree is simply a moot question. The future rights of the respondent under the decree are measured, not by the testimony which he gave upon the trial, but by the language of the judgment. Under the judgment as drawn, he plainly would have the right to kill and dispose of any of his birds at any time. He does not claim that his property rights in either the game animals or the birds is beyond the police power of the state. In the course of his brief upon this question it is said:

"If the lower court had thought it proper to decide the moot question of plaintiff's right to kill his expensive birds, we should not have objected, and if your honors think it necessary to decide that question, we certainly do not object. Indeed, to be of as much assistance as we may, we expressly concede that plaintiff has no right to kill, sell, or have possession of the carcasses of his birds during the time when the law declares it illegal."

It cannot be successfully contended that the provision of the decree which gives the right, whether it is exercised or not, to kill, sell, or have in possession the carcasses of the birds during the closed season covers a moot question. On the other hand, if the question of the right of the respondent to kill and dispose of his birds was not before the court, a provision in the judgment which gives him this right has no proper place therein.

The cause will be remanded with direction to the superior court to eliminate that clause from the judgment which reads as follows: "And to dispose of them in such manner as he sees fit." In all other respects the judgment is affirmed. Neither party will recover costs in this court.

MORRIS, C. J., ELLIS, and FULLERTON, JJ., concur.