Herman E. KOOP, Jr., Leonard Doubek, Albert J. Peters, Nicholas M. Wenner, Herman E. Koop, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16581.

United States Court of Appeals Eighth Circuit.

Nov. 13, 1961.

Donald I. Ryan, Brainerd, Minn., made argument for appellant; Ryan, Ryan & Ebert, Brainerd, Minn., with him on the brief.

John J. Connelly, Asst. U. S. Atty., St. Paul, Minn., made argument for appellee; Clifford Janes, U. S. Atty., St. Paul, Minn., with him on the brief.

Before VOGEL and BLACKMUN, Circuit Judges, and BECK, District Judge.

VOGEL, Circuit Judge.

Appellants herein were tried on an information in three counts charging violations of the provisions of the Migratory Bird Treaty Act, 16 U.S.C.A. §§ 703–711, inclusive, regulations promulgated thereunder, and 18 U.S.C.A. § 2.

The first count charged that the appellants Leonard Doubek, Albert J. Peters, Nicholas M. Wenner and Herman E. Koop, Jr., on or about October 7, 1959, at Koop's Ranch, Stearns County, Minnesota, each being a hunter, " * * * did hunt, attempt to kill and take migratory game birds, to wit, wild ducks in an area baited with shelled corn and other grains and feed, which corn and grain were used to and did lure, attract and entice said migratory game birds to, on and over the area where each said defendant hunter was attempting to take said migratory game birds; in violation of 16 U.S.C., 703, 704 and 707, and of Subsection 6.3(b) (9) * * *" of the Migratory Bird Regulations 1959–1960. Upon being found guilty by a jury, each of the appellants was fined $100 and costs in the amount of $85.92.

The second count charged appellants Wenner, Koop, Jr., and Peters with hunting and attempting to kill and take migratory birds, to-wit, wild ducks with the use and aid of live birds as decoys. Appellants were found not guilty thereof.

The third count charged Herman E. Koop, hereinafter referred to as Dr. Koop in order to avoid confusion, and Leonard Doubek with aiding and abetting the commission of the offenses charged in Counts 1 and 2 of the information (18 U.S.C.A. § 2). At the close of the evidence such charge was, on motion of the government, dismissed as to Doubek. Dr. Koop was found guilty by the jury.

He was fined $250 and costs in the sum of $85.94.

In this appeal it is claimed that the evidence was insufficient to support the verdicts upon the following grounds:

(1) There was no evidence to sustain the charge that defendants were shooting in a "baited area".

(2) There was no evidence to sustain the charge that defendants attempted to kill *wild* ducks.

(3) These mallard ducks which the defendants shot and shot at were not wild ducks.

(4) The mallard ducks on the premises were more than two generations removed from the wild and did not come under the baiting regulation.

(5) There was no evidence to convict the defendant Doubek.

In considering the insufficiency charge, we have in mind that the government was the prevailing party and is entitled to have the evidence viewed in the most favorable light tending to support the convictions and is entitled to all inferences which may be reasonably drawn in support of the jury's conclusions. Garner v. United States, 8 Cir., 1960, 277 F.2d 242; Northcraft v. United States, 8 Cir., 1959, 271 F.2d 184, 187; Connelly v. United States, 8 Cir., 1957, 249 F.2d 576, 585, rehearing denied December 13, 1957, certiorari denied, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716, rehearing denied, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1072.

With the exception of the question of the amount of corn or other bait present on the hunting area on October 7, 1959, there is little dispute or contradiction as to the facts testified to by the many witnesses. It is the inferences and conclusions which may be drawn therefrom which cause the difficulty. If the facts and such favorable inferences and conclusions as may be reasonably drawn therefrom would cause reasonable minds to differ, then the question of the guilt or innocence of the appellants was one of

fact to be determined by the jury and not one of law to be determined by the court.

The testimony discloses that the appellant Dr. Koop is a practicing physician and surgeon living at Cold Spring, Stearns County, Minnesota. In 1945 he began acquiring nearby real estate which ultimately totalled 1,280 acres. Farming attempts were unsuccessful so the property was turned into and operated as a dude ranch and has since been known as Koop's Ranch. On the property Dr. Koop created artificial ponds by damming up certain drainage areas. In 1959, the time with which we are here concerned, there were seven small ponds on the premises. A four-foot-high fence encloses the entire ranch. In order to make the place attractive for ducks, Dr. Koop planted wild feed, including Wisconsin giant rice, wild rice, wild potato, duck potato, celery, etc.

Ever since 1945 Dr. Koop has fed ducks on his ponds. This was generally done by putting corn in the water. Throughout the season of 1959 he fed approximately 250 bushels of corn. His stated purpose was two-fold: One, to keep the ducks alive, and, two, to keep them confined to the area. When they were fed regularly they stayed on the ponds, flying from one of the seven ponds to another but staying in the immediate vicinity.

Dr. Koop's practice over the years was to discontinue feeding the ducks for what he deemed to be a sufficient length of time before the opening day of the hunting season so that there would be no corn left in the ponds. In 1959 he fed the last corn on October 3rd, four days prior to the opening of the hunting season.

All of the seven ponds located on Koop's Ranch were within walking distance of each other. Ducks flew from one pond to another. Pond No. 5, where occurred most of the activity with which we are here concerned, was approximately 100 yards long by 50 yards wide.

Beginning in 1945 Dr. Koop commenced raising mallard ducks. At that time he bought ducklings, confined them for a while and then distributed them out on the different ponds or potholes on his ranch. He claimed to have raised mallard ducks continuously from 1945 to the present. In 1957 and 1958 he incubated eggs taken from captured mallards confined in his duck house. Each fall Dr. Koop would capture some brood stock for the following year. To capture the brood stock he enticed ducks, through feeding, into an open building and then closed the doors. In 1958 he captured about 70 hens and drakes, maintaining them through the winter, confined in a duck house. In the spring of 1959 he bought 50 additional ducks which he put out on his ponds together with the previously captured brood stock from the fall of 1958, thus, he claimed, trying to mix the new stock with the old. He contended that his brood stock in 1959, captured in the fall of 1958, was more than two generations removed from the wild. His total brood stock with the 50 ducks purchased for the year 1959 amounted to some 120 ducks. · Approximately 80 were hens. They produced an average of ten ducks each. The ducks which were not shot or captured for brood stock migrated in the fall.

Dr. Koop considers his ranch "a two day hunting place". He testified, "After they are bombarded, they get out of there. They leave. I would say they remain in that vicinity about two days and that's it. There is no hunting after that." He estimated that they shot approximately 20% to 25% of the ducks that he raised. The rest disappeared. He did not know where. He stated that he had no way of knowing if the mallards on his ranch were the mallards that were there the year before. This would seem to refute his assertion that his brood stock was more than two generations removed from the wild. He was unable to distinguish between wild mallards and the mallards that he released nor was there any way that he could identify the

mallards that he released when they were in the air flying. Until the ducks migrated he claimed that they were his ducks. "The mallard ducks, until the time they migrate from that ranch, leave the ranch, I consider them to be my ducks." Sometimes Dr. Koop marked the ducks before he put them out. In 1959 he did no such marking.

At noon on October 7, 1959, the five appellants herein were among the approximately 38 people who were present on the Koop Ranch. Dr. Koop had invited the hunters to his premises for hunting on that date. There was a charge of $25 per person per day for the privilege of hunting on Koop's Ranch. Sometimes this was paid to Mrs. Koop, in whose name title to the ranch was kept. On the morning of that day the appellants, together with the other hunters, met at the ranch buildings where they were instructed by Dr. Koop to check their guns for plugs, to make sure they had hunting licenses and duck stamps, not to shoot illegal birds or to hunt before twelve o'clock noon or after closing time. Thereafter the hunters were distributed so that there were hunters located on each one of the ponds on the Koop Ranch. Appellants Koop, Jr., Wenner and Peters were hunting at pond No. 5. Among them there was more or less of a general agreement that they would shoot only mallard ducks. Such appellants had hunting licenses, duck stamps, wooden decoys, a hunting dog, duck blinds, guns and were seen shooting over pond No. 5.

During the time the appellants and others were shooting on pond No. 5 numerous ducks, mallards, pintails, wood ducks and teal, flew in and out of the pond. The officers found and confiscated six ducks which had been shot at pond No. 5. Of the ducks so confiscated, one was a pintail and five were mallards.

The officers found shelled corn in and near all of the ponds on the Koop Ranch. Corn was found in a number of places at pond No. 5. Oats were also found at pond No. 5. No oats or other grain crops were growing in the vicinity at the time.

■ Under the provisions of the Migratory Game Bird Act the Secretary of the Interior is authorized and directed to determine when, to what extent, if at all, and by what means migratory game birds may be hunted. At the time in question there were in effect duly promulgated regulations prohibiting certain methods by which migratory game birds might be taken. One of the prohibited methods was as follows, 50 C.F.R. § 6.3 (b) (9), 1949 ed., 1960 Supp.:

"By the aid of baiting, *or on or over any baited area.* As used in this subparagraph, 'baiting' shall mean the placing, exposing, depositing, distributing or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt or other feed so as to constitute for such birds a lure, attraction or enticement to, on or over any area where hunters are attempting to take them; *and 'baited area' means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt or any other feed whatsoever capable of attracting such birds is directly or indirectly placed, exposed, deposited, distributed or scattered.* Nothing in this subparagraph shall prohibit the taking of such birds over standing crops, flooded standing crops (including aquatics), flooded harvested croplands, grain crops properly shocked on the field where grown, or grains found scattered solely as the result of normal agricultural harvesting." (Emphasis supplied.)

The first contention of the appellants is that they were not hunting in a baited area. They point out that the information on which they were tried charged them with hunting wild ducks "in an area baited with shelled corn and other grains * * * ". They concede that if they had been charged with shooting ducks "by the aid of baiting" and if the ducks shot were *wild* ducks (to be dis-

cussed under appellants' next point), there was sufficient evidence to support the jury's verdict because they admit that the ducks on Koop's Ranch had been heavily fed up to four days before the opening of the hunting season. Appellants Koop, Jr., Wenner and Peters concede that they were hunting on pond No. 5. They deny, however, that pond No. 5 was "baited area". They point to the fact that Dr. Koop quit feeding four days before the opening of the hunting season and they would interpret the regulation to the effect that what had been done with bait before the shooting took place was of no consequence but, rather, that in order to constitute "baited area" bait must be there at the time of the commission of the act charged. They say that the appellants cannot be found guilty "unless there was some evidence of corn in the pond in a quantity and in a place which was a violation of the regulation", that is, "capable of attracting such birds".

Appellants would disregard the corn found at pond No. 5, pointing to the meager amount in evidence (five kernels) and their claim that such corn was found in water too deep for puddle ducks, such as mallards, to reach, thereby indicating that it was not of sufficient quantity nor in a suitable place to be "capable of attracting such birds". The evidence in the record, however, clearly establishes that small grain and oats were seen on the shore of pond No. 5 near where the appellants had placed the decoys and also at several other spots on pond No. 5; that the immediate vicinity was "all padded down with duck tracks"; that Agent Fisher, who had collected the five kernels of corn in question, testified that he made no attempt to collect all the corn he had seen but only tried to take a sample of the type of feed he found; furthermore, that the corn he removed was at a place where the water was only ten inches to one foot in depth (which depth was shown to be within the reach of mallards); that corn was found at all of the ponds on the Koop Ranch on the opening day of hunting season; that the

ducks, when they were startled by the hunters' approach or by shooting, would fly from one pond to another.

Considering the evidence with reference to baiting the ponds, the presence of corn at all of the ponds on the day in question, the fact that the ponds were in close proximity to each other and that ducks would fly from one pond to another, we must conclude that substantial testimony supported a finding that the entire area of Koop's Ranch around the seven duck ponds was "baited area" "capable of attracting such birds" within the meaning of the regulation.

But even assuming, *arguendo*, that the corn that was found on October 7th was not in a place and not of a quantity capable of attracting (an assumption not justified by the record), appellants' position may nevertheless not be sustained. They contend that baiting with corn which took place before the shooting and where corn was no longer present at the time of the shooting is of no consequence and could not constitute "baited area" within the meaning of the regulation. In support of this contention appellants cite Carty v. United States, 9 Cir., 1951, 190 F.2d 99, rehearing denied July 10, 1951. In so doing, however, they misconstrue the import of that case. There the court stated that an instruction which read

"* * * You are instructed that the regulations concerning the baiting of migratory birds is violated whether the hunters had pursued the indirect method of baiting before the season opened so as to keep the birds in the hunting area to be shot after the season opens * * * or by directly placing the grain or other feeds in front of the blinds or stands during the season" (at page 101 of 190 F.2d)

was erroneous, *not because it was an incorrect statement of the law* but because

"* * * the information made the specific charge that the birds were taken over 'baited ponds and

areas by means, aid and use of shelled grain.' This charge could not be established by proof of a baiting before season. if there were no shelled grain in the area contemporaneously with the shooting. Notwithstanding we believe the jury might have found defendants guilty of the charge as laid, this instruction amended the information and defendants were tried upon a charge different from that which they were called to defend by the language thereof. We cannot therefore speculate upon how much weight the jury may have given to the instruction. This was error superinduced by the agents of the government. Nor is this a technicality. The giving of the instruction constituted a flagrant abuse of due process." 190 F.2d at page 101.

Carty cannot be said to hold any more than what the court there stated:

"If it be conceded that a possible interpretation of the statute would permit a charge of baiting before the season opened, so as to keep the birds in hunting area to be shot after the season opened, [citing Cerritos Gun Club v. Hall, 9 Cir., 1938, 96 F.2d 620, 624] in this case the instruction was erroneous." 190 F.2d at page 101.

In Cerritos Gun Club, cited in Carty, supra, the same court was concerned with a regulation which was similar in its provisions to that with which we are here concerned. There the court stated, at page 96 F.2d 624:

"We believe the appellants have violated the Secretary's regulation whether by pursuing the indirect method of baiting before the season opens to keep the birds there to be shot after the season opens, so that hunters may flush them as they walk or punt over the preserves, or by directly placing the grain in front of the blinds or stands during the season. Wherever the grain is placed on the preserves, the wind will create lines of the birds' flight, to and from it, which will aid the slaughter from blinds located for the purpose."

We agree with the court in Cerritos Gun Club and hold that the appellants here violated the regulation, whether they did so by the indirect method of so baiting before the season as to create an attraction for the birds after the season opened or by the direct method of placing the grain in the water in front of the blinds during the hunting season. The area of Koop's Ranch surrounding the seven ponds constituted "baited area" within the meaning of the regulation under either hypothesis.

Appellants' next contention encompasses claimed errors 2, 3 and 4 and will be treated as one. The gist of their position is that excluding the pintail duck,[1] the mallards which were shot and shot at were not *wild* ducks within the meaning of the law and the regulations. Appellants assert:

"We now come to the important question in the case, namely, were the mallard ducks which the defendants Wenner, Peters and Herman Koop, Jr., admittedly shot and shot at *wild* ducks? If these mallards were wild ducks and were shot over a baited area the verdict was not only supported by the evidence but those defendants and Dr. Koop were guilty beyond any doubt."

The Migratory Bird Treaty Act Aug. 16, 1916, 39 Stat. 1702, defines migratory game birds as:

"(a) Anatidae or waterfowl, including brant, wild ducks, geese, and swans."

---

1. Of the six ducks confiscated by the game warden it is conceded by the appellants that the pintail was a wild duck. There is, however, no evidence which connects any of these appellants with shooting or attempting to shoot the pintail. Rather, the evidence is uncontradicted that it was shot by another hunter who was not charged herein. It happened to have been retrieved by one of the appellants' dogs. We think the evidence with reference to the pintail may, insofar as this appeal is concerned, be disregarded.

The regulations promulgated by the Secretary of the Interior pursuant to 16 U.S.C.A. §§ 701 et seq., have used similar definition consistently since.

█ It is common knowledge that ducks, and particularly mallard ducks, lend themselves to being tamed or domesticated and that ducks generally found in most farmyards trace their ancestry back to the wild and untamed ducks with whose protection and care the Migratory Bird Treaties and regulations were concerned. Concededly, however, the law was not meant for, nor may it regulate or control the use of, such tamed or domesticated ducks.

█ It is the contention of Dr. Koop and the other appellants that the mallard ducks which inhabited the ponds at the Koop Ranch which were shot at and shot on October 7, 1959, were more than two generations removed from the wild and that until the ducks migrated in the fall they were "his ducks"; in other words, that they had become domesticated.

There is here a futile attempt to defend on the grounds "that one of the regulations provided that mallards more than two generations removed from the wild are not migratory birds". There are other references made to the so-called "regulation". No such regulation has been cited to us by counsel on either side nor has search disclosed the existence of such regulation. Furthermore, Dr. Koop testified that he could not tell whether the ducks in evidence were "his ducks" or wild ducks, nor could other witnesses so distinguish. The ducks had every appearance of being wild ducks. We pretermit any discussion or consideration of an alleged but unestablished regulation pertaining to mallard ducks two generations removed from the wild.

But assuming that the mallard ducks were actually raised on the Koop Ranch, our question, then, is whether ducks having been hatched from brood stock which had been captured in the fall of 1958 and confined through the winter by Dr. Koop, and also from ducks purchased by him in the spring of 1959, all of which were nesting upon artificial ponds of his creation, fed by him through the summer in order to keep them there, but which ducks were completely unconfined from flying anywhere they wished and from mingling with other ducks concededly wild, and which ducks did in fact migrate in the fall of the year and which in past years had not been shown to return to Dr. Koop's ponds, can be said not to be wild ducks and thus not included under the Migratory Bird Treaty Act or the regulations.

In determining when a "wild" animal or "wild" birds are no longer considered "wild", courts and writers have made the major consideration one of possession and control. In 2 Cooley, Torts (3d Ed.), p. 838, it is said:

"There is no property in wild animals until they have been subjected to the control of man. If one secures and tames them, they are his property; if he does not tame them, they are still his, so long as they are kept confined and under his control."

In upholding the constitutionality of the Migratory Bird Treaty Act in State of Missouri v. Holland, 1920, 252 U.S. 416, 434, 40 S.Ct. 382, 384, 64 L.Ed. 641, Mr. Justice Holmes said:

" * * * Wild birds are not in the possession of anyone; and possession is the beginning of ownership."

See also Sickman v. United States, 7 Cir., 1950, 184 F.2d 616, 618, certiorari denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366; 3 C.J.S., Animals, § 6, p. 1088.

█ Even if the animals or wild birds have been in the control of a person, thus giving him a property right, once this control is relinquished the property right is destroyed. 24 Am.Jur., Game and Game Laws, § 4, pp. 375–376; 2 Am.Jur., Animals, § 10, pp. 697–698; 38 C.J.S., Game, § 2, pp. 2–3. In Graves v. Dunlap, 1915, 87 Wash. 648, 152 P. 532, 534, L.R.A.1916C, 338, the court was dealing with the ownership and right to possession of game animals and birds. The court there stated:

" * * * if the animals return to their wild state, the property right

ceases. That the property right is a defeasible one is recognized by Blackstone. In 1 Cooley, Blackstone (4th Ed.) p. 744, referring to this subject, it is said:

" 'In all these creatures, reclaimed from the wildness of their nature, the property is not absolute, but defeasible; a property that may be destroyed if they resume their ancient wildness and are found at large. For if the pheasants escape from the mew, or the fishes from the trunk, and are seen wandering at large in their proper element, they became ferae naturae again, and are free and open to the first occupant that hath ability to seize them. * * * '

"Animals ferae naturae, if reclaimed and kept in inclosed ground, are property which will pass to the executors and administrators of a deceased person."

Dr. Koop asserts possession and control of the mallards through feeding and leaving them undisturbed throughout the spring and summer up to the hunting season. He claims that the mallards were confined, even though they could obviously fly from one pond to another and, of course, could fly over the four-foot fence which surrounded his ranch. The evidence is that neither Dr. Koop nor anyone else could distinguish the mallards he raised from other mallards which might come into the Koop ponds, with the exception of two "tame mallards" which behaved and looked differently from the others. (They were not wary and could be approached up to a distance of six feet; they would not take flight when the other ducks did; and they were larger than the other mallards.) Dr. Koop, however, disclaimed ownership of these two mallards, while the government claims that they were being used as live decoys. (The jury found contrary to the government's assertion on Count 2.) There is substantial testimony in the record which indicates that immediately south of the Koop Ranch there were other ponds or areas covered with water and that hundreds of other mallards had been seen flying there shortly before the opening of the hunting season. There was nothing to prevent a commingling of the mallards raised by Dr. Koop with these "strange" mallards. We think it must be held that the mallard ducks here were no more within the possession and control of Dr. Koop than were the pintails, wood ducks and teal that admittedly flew in and out of the ponds on his ranch and which undoubtedly shared in his bounty. They were free to go and come as they would. Admittedly, the mallards hatched and raised on Koop's Ranch and which were not shot or captured in the fall for brood stock migrated yearly. He knew not where, and he did not know if they returned the following spring. Under the circumstances existing on the ranch, therefore, it would seem perfectly clear that even the mallards raised by Dr. Koop, if they could have been identified or distinguished from the other ducks, were wild ducks within the meaning of the law and of the regulations. We accordingly hold that the contention of the appellants may not be sustained. A contrary conclusion could defeat the very purpose of the Migratory Bird Treaty Act and handicap beyond measure enforcement of the law and regulations thereunder.

Although not determinative of the issue, we think it should be pointed out here that each one of the hunters on the Koop Ranch, those who were prosecuted as well as those who were not, must have felt that he was hunting wild ducks at the time. Each had supplied himself with a gun that was properly plugged so that it could not shoot more than three shells. (Dr. Koop, who inadvertently failed to plug his gun, left it in the woods and did not shoot at all because of his omission.) Each had a hunting license, duck stamp and the other paraphernalia necessary to the hunting of wild ducks. Each carefully waited until noon on October 7, 1959, before starting to shoot. Each was warned by Dr. Koop not to shoot before the opening or after the closing hours. There can be little doubt but what it was the intention of the

appellants to hunt wild ducks, albeit an attempt has been made to establish that they shot and shot at only domesticated birds.

The last contention before us is by the appellant Doubek. He claims that there was no evidence to sustain his conviction of attempting to take migratory game birds in a baited area. The evidence indicated that Doubek was found in the vicinity of pond No. 1. Pond No. 1 was a baited pond and within the area of baiting on the Koop Ranch. Doubek had with him a license, a gun, shells, and a duck stamp. Upon inquiry, he said the hunting "wasn't too good, that he hadn't gotten any ducks". He further said that there were a lot of small ducks and that he "couldn't hit the ducks". While at the trial Doubek denied that he was hunting and explained his presence in the hunting area in that he had been hired by Dr. Koop to keep uninvited hunters off the premises, reasonable inferences following the testimony regarding his presence at baited ponds, his possession of gun, license, duck stamp and shells fully justified the conclusion of the jury that he was guilty as charged.

Affirmed.