103 P.3d 203 (2004)
124 Wash.App. 566
CITIZENS FOR RESPONSIBLE WILDLIFE MANAGEMENT; Inland Northwest Wildlife Council; Washingtonians for Wildlife Conservation; Citizens for Washington Wildlife; Naia Trust; Ballot Issues Coalition; King County Outdoor Sports Council; Hunters Heritage Council; Washington Falconers Association; North American Falconers Association; Purse Seine Vessel Owners Association; Washington State Sheep Producers; and Washington Women for Commercial Fishing, Appellants,
v.
STATE of Washington, Respondent. and
Protect Pets and Wildlife, Defendant/Intervenors.
No. 30940-8-II.
Court of Appeals of Washington, Division 2.
December 7, 2004.
*204 Richard Allan Dubey, Scott Michael Missall, Constance Susan M. Martin, Short, Cressman & Burgess, PLLC, Seattle, WA, for Appellants.
Shawn Timothy Newman, Attorney at Law, Mary Sue Wilson, Atty General's Office/Fish & Wildlife Div, Olympia, WA, for Respondents.
ARMSTRONG, J.
Citizens for Responsible Wildlife Management and twelve other organizations challenge Initiatives 655 and 713 (the Initiatives), which prohibit various hunting and trapping practices. Citizens argues that the Initiatives violate the State's duty to control and manage wildlife for the public's benefit (public trust doctrine). Assuming without deciding that the public trust doctrine applies, Citizens' challenge fails because the State did not relinquish control over the public's interest in the State's natural resources. Accordingly, we affirm summary judgment in favor of the State.

FACTS
In November 1996, Washington voters approved Initiative 655, which made it unlawful to hunt black bear with the aid of bait or to hunt black bear, cougar, bobcat, or lynx with the aid of dogs. Initiative 655 is codified at RCW 77.15.245. In November 2000, Washington voters approved Initiative 713, which prohibits the use of body-gripping traps and other devices to capture animals and bans the use of two poisons, sodium fluoroacetate and sodium cyanide. Initiative 713 is codified at RCW 77.15.192, .194, .196, and .198.
Citizens sued the State to enjoin implementation and enforcement of the Initiatives. Citizens alleged that the Initiatives violate the public trust doctrine. Both parties moved for summary judgment. The trial court granted the State's motion, ruling that the Initiatives do not violate the public trust doctrine.

ANALYSIS

I. Summary Judgment Standard
When reviewing a summary judgment order, we engage in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c).

II. The Scope of Washington's Public Trust Doctrine
Citizens argues that the public trust doctrine applies to upland wildlife. And, according *205 to Citizens, I-655 and I-713 impermissibly relinquish the State's control over renewable natural resources and wildlife.
The public trust doctrine concerns the public's right to navigation and the incidental rights of fishing, boating, swimming, waterskiing, and other related recreational uses of public waters. Caminiti v. Boyle, 107 Wash.2d 662, 669, 732 P.2d 989 (1987) (quoting Wilbour v. Gallagher, 77 Wash.2d 306, 316, 462 P.2d 232 (1969)).
Title to animals ferae naturae[1] belongs to the state in its sovereign capacity and the state holds this title in trust for the peoples' use and benefit. Graves v. Dunlap, 87 Wash. 648, 651, 152 P. 532 (1915). As the Washington Supreme Court explained in Cawsey v. Brickey, 82 Wash. 653, 656, 144 P. 938 (1914):
Under the common law of England all property right in animals ferae naturae was in the sovereign for the use and benefit of the people. The killing, taking and use of game was subject to absolute governmental control for the common good. This absolute power to control and regulate was vested in the colonial governments as a part of the common law. It passed with the title to game to the several states as an incident of their sovereignty and was retained by the states for the use and benefit of the people of the states, subject only to any applicable provisions of the Federal constitution.
No Washington case has applied the public trust doctrine to terrestrial wildlife or resources. See, e.g., State v. Longshore, 141 Wash.2d 414, 5 P.3d 1256 (2000) (second degree theft conviction for stealing naturally occurring clams on private tidelands); R.D. Merrill Co. v. State, 137 Wash.2d 118, 969 P.2d 458 (1999) (water rights); Weden v. San Juan County, 135 Wash.2d 678, 958 P.2d 273 (1998) (county ordinance banning personal watercraft on all marine waters and one lake); Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 858 P.2d 232 (1993) (public trust doctrine not germane to issues concerning water rights to non-navigable stream); Caminiti, 107 Wash.2d at 663, 732 P.2d 989 (private recreational docks on state-owned tidelands and shorelands). But we need not decide whether the public trust doctrine applies here because, even if it does, Citizens' challenge fails.

III. The Public Trust Doctrine and the Challenged Initiatives
A statute enacted through the initiative process is presumed constitutional and the party challenging it bears the burden of proving it unconstitutional beyond a reasonable doubt. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762 (2000). Nonetheless, courts review legislation under the public trust doctrine with a heightened degree of judicial scrutiny, as if measuring the legislation against constitutional protections. Weden, 135 Wash.2d at 698, 958 P.2d 273 (quoting Ralph W. Johnson, et al., The Pub. Trust Doctrine and Coastal Zone Mgmt. in Washington State, 67 WASH. L.REV. 521, 525-27 (1992)).
The public trust doctrine developed out of the public's need for access to navigable waters. Caminiti, 107 Wash.2d at 669-70, 732 P.2d 989; Orion Corp. v. State, 109 Wash.2d 621, 640, 747 P.2d 1062 (1987). This policy is expressed, in part, in article 17, section 1 of the Washington Constitution, which asserts the state's ownership of the beds and shores of the state's navigable waters. Rettkowski, 122 Wash.2d at 232, 858 P.2d 232.
Washington's ownership of tidelands and shorelands has two parts. Caminiti, 107 Wash.2d at 668, 732 P.2d 989. The jus privatum is the private property interest under which the state may convey title to these lands. Caminiti, 107 Wash.2d at 668, 732 P.2d 989. But at issue here is the jus publicum, or public authority interest. Caminiti, 107 Wash.2d at 668, 732 P.2d 989.
The public trust doctrine protects "public ownership interests in certain uses of navigable waters and underlying lands, including navigation, commerce, fisheries, recreation, *206 and environmental quality." Weden, 135 Wash.2d at 698, 958 P.2d 273 (quoting Johnson, supra, at 524). In other words, the public trust doctrine grants the state dominion and sovereignty over these lands to hold in trust for the public. Caminiti, 107 Wash.2d at 669, 732 P.2d 989. And this duty devolves on the state, not on a particular agency. Rettkowski, 122 Wash.2d at 232, 858 P.2d 232.
When deciding if challenged legislation violates the public trust doctrine, we ask: (1) whether the state has given up its right of control over the jus publicum; (2) if so, whether the state (a) has promoted the public's interest in the jus publicum, or (b) has not substantially impaired it. Caminiti, 107 Wash.2d at 670, 732 P.2d 989 (citing Illinois Cent. R.R. v. Illinois, 146 U.S. 387, 453, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)). Individual states have the authority to define the limits of the lands held in public trust and to recognize the private rights in these lands as they see fit. Longshore, 141 Wash.2d at 428, 5 P.3d 1256 (looking "solely to Washington law to determine" the scope of the public trust doctrine).
"An exercise of the initiative power is an exercise of the reserved power of the people to legislate." Amalgamated Transit, 142 Wash.2d at 204, 11 P.3d 762 (citing State ex rel. Heavey v. Murphy, 138 Wash.2d 800, 808, 982 P.2d 611 (1999)). And when the voters approve an initiative, they exercise the same power of sovereignty as the legislature does when it enacts a statute. Amalgamated Transit, 142 Wash.2d at 204, 11 P.3d 762 (citing Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 556, 901 P.2d 1028 (1995)).
In Caminiti, the Supreme Court held that RCW 79.90.105 did not violate the public trust doctrine; the statute allows owners of residential property abutting state-owned tidelands and shorelands to build recreational docks on these lands without paying the state. Caminiti, 107 Wash.2d at 665-66, 732 P.2d 989. The court concluded that the legislature had given up relatively little right of control over the jus publicum. For example, the challenged statute did not apply to harbor areas in navigable waters in front of and one mile on either side of cities bordering navigable waters. And the statute limited dock use to private recreational purposes, specifically authorized the Department of Natural Resources to regulate the docks, and subjected the docks to local regulations. Finally, the court identified the legislature's ability to repeal the statute as the "ultimate state control." Caminiti, 107 Wash.2d at 672-73, 732 P.2d 989.
In Weden, the court held that a San Juan County ordinance banning the use of motorized personal watercraft on all marine waters and one lake did not violate the public trust doctrine because the county had not given up control over its waters. Weden, 135 Wash.2d at 699, 958 P.2d 273. The court found that while the ordinance prohibited a particular form of recreation, the waters were open to the entire public, including personal watercraft owners who use other recreational methods. And the court noted that "it would be an odd use of the public trust doctrine to sanction an activity that actually harms and damages the waters and wildlife of this state." Weden, 135 Wash.2d at 699-700, 958 P.2d 273.
Here, the State and interveners identify numerous ways in which the State maintains control over wildlife. For example, the legislature and the citizens of Washington retain the power to amend or repeal the statutes codifying I-655 and I-713 under Washington Constitution article II, section 41,[2] and article II, section 1,[3] respectively. In fact, the legislature amended I-655 in 2000 to allow the Fish and Wildlife Commission *207 to authorize using dogs to address public safety concerns related to cougars. ESSB 5001, 56th Leg., Regular Session (Wash.2000). And the commission responded to the legislature's amendment by promulgating regulations governing public safety cougar removals. WAC 232-12-243.
The Initiatives' bans are also subject to important exceptions. State employees or agents acting in their official capacity may kill black bears with the aid of bait or hunt black bear, cougar, and certain other animals with dogs to protect livestock, domestic animals, private property, or public safety. RCW 77.15.245(1)(a), (2)(a). And I-655 does not prohibit using bear feeding stations to prevent damage to commercial timberland. RCW 77.15.245(1)(b). Public agencies, universities, and scientific or educational institutions with a properly issued permit or memorandum of understanding may use bait to attract black bear for scientific purposes. RCW 77.15.245(1)(c).
Initiative 713 excepts "[c]age and box traps, suitcase-type live beaver traps, and common rat and mouse traps" from its definition of "body-gripping trap." RCW 77.15.192(2). And I-713 allows the use of three types of traps with a properly granted special permit. RCW 77.15.194(4). Initiative 713 also allows the Department of Fish and Wildlife (WDFW) director to grant permits to department employees or agents to use otherwise banned traps where using such traps is the only practical means of protecting threatened or endangered species. RCW 77.15.194(4)(c). A similar provision applies to the United States Fish and Wildlife Service's use of traps to protect threatened or endangered species listed in the Federal Endangered Species Act.[4] RCW 77.15.194(5).
In addition, WDFW has authority to adopt rules to "`fill in the gaps'" in legislation if necessary to implement the general statutory scheme. Armstrong v. State, 91 Wash.App. 530, 538, 958 P.2d 1010 (1998) (quoting Hama Hama Co. v. Shorelines Hearings Bd., 85 Wash.2d 441, 448, 536 P.2d 157 (1975)). Here, WDFW has promulgated rules implementing both initiatives. See, e.g., WAC 232-12-001, -071, -141, -142 (regulations regarding I-713); WAC 232-12-243 (public safety cougar removals under I-655).
Moreover, WDFW has management tools other than those the challenged initiatives proscribe. WDFW retains control over wildlife by setting hunting seasons and by regulating hunting methods, areas of the hunt, and the sex and age of the animals that may be taken. See, e.g., WAC 232-28-272 (Black Bear and Cougar Hunting Season and Regulations), -351 (Deer Season and Limits), -352 (Elk Season and Limits).
Finally, other statutes restrict the public's ability to hunt wildlife. See, e.g., RCW 77.15.450 (class C felony to hunt big game with aid of spotlight while in possession of a firearm or bow and arrow), .675 (unlawful to hunt while under influence of intoxicating liquors or drugs).
Citizens also argues that because the legislature has expressly delegated responsibility for the State's natural resources to state agencies, citizen initiatives and referenda that interfere with these duties are precluded. But the cases Citizens cites do not stand for such a broad proposition. Rather, the cited cases concern legislative grants of authority to cities and counties and hold that initiative or referendum rights do not exist where the legislature has delegated power to a city or county legislative authority. See, e.g., Snohomish County v. Anderson, 123 Wash.2d 151, 156, 868 P.2d 116 (1994); Citizens for Fin. Responsible Gov't v. City of Spokane, 99 Wash.2d 339, 345, 662 P.2d 845 (1983); Leonard v. City of Bothell, 87 Wash.2d 847, 852-54, 557 P.2d 1306 (1976); Neils v. City of Seattle, 185 Wash. 269, 282-83, 53 P.2d 848 (1936); Save Our State Park v. Bd. of Clallam County Comm'rs, 74 Wash.App. 637, 647-48, 875 P.2d 673 (1994); Lince v. City of Bremerton, 25 Wash.App. 309, 312-13, 607 P.2d 329 (1980). Here, the Initiatives do not interfere with a state grant of authority to a local government.
We conclude that in passing I-655 and I-713, Washington voters did not give up control over the state's natural resources in violation of the public trust doctrine. Rather, *208 the Initiatives as implemented provide specific restrictions on techniques for hunting and trapping certain wild animals. If anything, this is an assumption of greater rather than lesser control. Accordingly, we affirm the summary judgment in favor of the State.
Affirmed.
I concur: SEINFELD, J.P.T.
QUINN-BRINTNALL, C.J. (concurring in the result).
I concur with the result reached by the majority. I write separately to express my view that the initiative power is an exercise of the reserved power of the people to legislate and, as such, must promote future public interests under the public trust doctrine.
I do not dispute the wisdom of the specific Initiatives at issue here, nor do I disapprove the Department of Fish and Wildlife's attempts to reasonably implement them. But if the legislature has a duty to hold the State's resources in public trust, and it does (Caminiti v. Boyle, 107 Wash.2d 662, 669-70, 732 P.2d 989 (1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988)), the people acting through initiative under their reserve authority are also bound to act in accord with this duty.
Washington expressly recognized the public trust doctrine in 1987. More than 10 years later, our state's highest court addressed the issue again stating: "This court did not expressly adopt the public trust doctrine until 1987, but indicated then that the doctrine has always existed in Washington law." Weden v. San Juan County, 135 Wash.2d 678, 698, 958 P.2d 273 (1998) (citing Caminiti, 107 Wash.2d at 669-70, 732 P.2d 989).
Washington's inherent public trust doctrine prohibits disposing of the public interest in the State's natural resources in a manner that substantially impairs the public's right of access, unless the action promotes the overall interests of the public. Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993).
I agree with Citizens that title to animals ferae naturae belongs to the State in its sovereign capacity and that under Washington's inherent public trust doctrine the State and its people hold this title in trust for the use and the benefit of all the people of this state, including those yet unborn. See Graves v. Dunlap, 87 Wash. 648, 651, 152 P. 532 (1915). I part company with the majority's analysis in those instances where it, and several of the cases on which it relies,[5] presumes that the "State" referred to in the public trust doctrine is synonymous with those citizens alive in Washington State on a certain date or voting in a specific election. Defining "State" in this narrow way suggests that whatever a majority of the citizens voting on any given initiative on a particular date decide will control the disposition, management, and potential exhaustion of our natural resources.
But the sovereign's duty to manage its natural resources recognized in the public trust doctrine is not time limited, and the primary beneficiaries of the sovereign's exercise of its public trust are those who have not yet been born or who are too young to vote. Thus, the sovereign authority to regulate natural resources is circumscribed by its duty to manage natural resources well for the benefit of future generations. And when the sovereign exercises this authority, by executive order, legislative enactment or public initiative, the tenets of the public trust doctrine must be satisfied.
I would expressly hold that the public trust doctrine applies to the Initiatives at issue here and require that they comply with the public trust doctrine.
Professor William H. Rodgers, Jr. expressed the requirements of the public trust doctrine as it applies to submerged lands:
Apart from the inevitable search for accommodation, the question remains what types of encroachments upon public trust properties go "too far" to win judicial acceptance. The classical test of Illinois Central [Railroad Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)], which is suggestive of contemporary nuisance law, is whether there has been a *209 substantial impairment of the public uses. This suggests we should look for damage not justifications for it, and therefore balancing is to be disregarded if the toll is unacceptably high.
1 WILLIAM H. RODGERS, JR., Public Trust Doctrine in ENVIRONMENTAL LAW § 2.20 at 166 (1986):
Under this damages test, to determine whether an initiative complies with the public trust doctrine, we must determine: (1) whether the people by initiative have given up the State's right/duty to control the jus publicum and (2) if so, whether this relinquishment (a) promotes the future interests of the public in the jus publicum, or (b) substantially impairs the public's future interest in these resources. See Caminiti, 107 Wash.2d at 670, 732 P.2d 989. See also Illinois Cent., 146 U.S. at 453, 13 S.Ct. 110.
In my view, because our goal must be preservation of these resources for future generations, rather than focusing on the first aspect of the Caminiti test  whether there was a relinquishment  we must concentrate our analysis on the second  does the action damage or impair the public's future interest in its natural resources. And in performing this analysis, we do not evaluate the merits of the reasons for the action or the professed needs of those supporting the use or exhaustion of the resources held in the public trust. If the damage to the resource is unacceptably high, the action violates the duty to preserve the public's natural resources for the benefit of future generations. Thus, the balancing of the current competing interests must give way to the people's sovereign duty to hold the public property in trust.
Applying that test to the Initiatives, I find no evidence on this record that the Initiatives will damage the public's interest in its natural resource or substantially impair the public's use of its resources. Thus, the Initiatives do not violate the State's duty under the public trust doctrine to manage Washington's natural resources for the benefit of present and future generations, and I concur in the result reached by the majority.
NOTES
[1] Animals ferae naturae are wild, untamed, or undomesticated. See BLACK'S LAW DICTIONARY (7th ed.1999) at 635.
[2] Article II, section 41 provides that the legislature may amend initiatives within two years of enactment by two-thirds vote of all the members elected to each house and that after two years, an initiative can be amended or repealed like other laws.
[3] Article II, section 1 provides in relevant part: "[T]he people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature."
[4] 16 U.S.C. § 1531 et. seq.
[5] E.g. Caminiti, 107 Wash.2d 662, 732 P.2d 989.