## STAHL v. UNITED STATES.

### No. 12822.

Circuit Court of Appeals, Eighth Circuit.

Oct. 18, 1944.

William L. Vandeventer, of Springfield, Mo., for appellant.

Otto Schmid, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., and Sam O. Hargus, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellant, Dr. Fred A. Stahl, was convicted on two counts of an indictment containing three counts, charging sales of morphine at Springfield, Missouri, to one Joe Griffin "not in the course of his professional practice only", in violation of 26 U.S.C.A. Int.Rev.Code, § 2553, and he appeals. The first count, on which appellant was acquitted, charged the sale of 54 quarter-grains of morphine sulphate on September 3, 1943; the second and third, on which he was convicted, charged a sale on September 6th of 60 quarter-grains of morphine sulphate, and a sale on September 9th of 100 quarter-grains of morphine sulphate.

The testimony tended to show that Joe Griffin was a narcotic addict who had lived in Springfield where he had been acquainted with Dr. Stahl for about six.years. In company with Narcotic Agent Hooker, Griffin went from Kansas City to Springfield on September 2d. He testified that after having been provided with marked money by Hooker he bought morphine from the doctor· on September 3d, but the doctor, who testified on his own behalf, denied having had any contact or transaction with Griffin on that day, and, as noted, there was no conviction on the first count. On September 6th Griffin was searched and found to have no morphine on his person and was provided with $25 of marked money with which he proceeded to the doctor's office. Hooker and Highway Patrolman Collier followed him to the office and waited for him outside. When he came out in about twenty minutes, the officers found that he had 60 quarter-grains of morphine in his possession and seven dollars of the marked money. On September 9th, Hooker took adjoining rooms in the Midway hotel, one for himself and one for Griffin. Griffin contacted the doctor and requested him to come to his room and the doctor came. Some fifteen minutes before the doctor's arrival Griffin was searched and found to have no narcotics and was provided with $50 in marked bills. The doctor delivered 91 quarter-grains of morphine to Griffin in

the room, and as soon as the doctor left Narcotic Agent Hooker rushed in and took the morphine from Griffin. He saw some one going down the stairway and followed after the person. It proved to be Dr. Stahl. He then followed the doctor to the street where two police officers were waiting. They arrested the doctor and took him to his office. He was asked how much money he had, and produced some fifty or sixty dollars in bills, among which there was a marked five dollar bill which had been supplied to Griffin on September 6th. None of the marked money given to Griffin on September 9th was found in the doctor's possession. Two of the officers testified that the doctor admitted during the conversation in his office on September 9th, that he had sold narcotics to Joe Griffin.

Griffin's testimony was to the effect that the doctor had never examined or treated him as a patient when he sold him the narcotics but there were simply sales of narcotics. Defendant testified he first saw Griffin six years prior to the transactions in question, when he complained of chest and head pains and was spitting blood. He examined him and saw the scar of a previous sinus operation on the inside of his nose. He also administered morphine hypodermically then. He later saw him once or twice a year, and up to last May, 1943, hadn't seen him for a year or two. He remembered him when he came in on the 6th and examined him and found tuberculosis of the chest and lungs. In August, 1943, he treated him for a sprained knee.

The doctor further testified that he examined Griffin at the office on September 6th and found tuberculosis, and he then treated him as a patient, giving him "a shot" of morphine for which Griffin paid him only two dollars. He denied giving Griffin any morphine to take out on that day, and testified that he thought Griffin had stolen the bottle of morphine from which the hypodermic dose was taken. He said he advised Griffin to rest for a week or two because of his tuberculosis. With the understanding that Griffin was to go away for a rest, defendant says he gave him 91 quarter-grains of morphine on the 9th at the hotel and a hypodermic of nine quarter-grains but charged and received only $5 for the call and nothing for the morphine. Griffin testified he had known Dr. Stahl for about six years; that the doctor never examined him when he bought narcotics from him, and that he never coughed

or spit blood. He says he paid the doctor $18 on the 6th in payment of the 60 quarter-grains of morphine, and $25 on the 9th in payment of the 91 quarter-grains.

Doctors Sartin, Vinyard and Roseberry testified in behalf of defendant to the effect that morphine was an accepted pain alleviant and, while not a cure for tuberculosis, would serve to rest the lungs and prevent hemorrhages and relieve the sufferer of pain so that he could rest. They further testified a confirmed addict would require much more morphine to achieve this result than a non-addict, and also that an addict loses his moral integrity and will lie and steal to get narcotics.

One Miss Beazley testified she was a patient of defendant and saw Griffin in defendant's office in August, and that he then coughed, complained of having tuberculosis and needing a rest. Griffin testified he did not remember any such occurrence.

The court instructed the jury that the issue on all three counts was whether Griffin was a good faith patient of the defendant, and whether the defendant administered or dispensed the drug described in the indictment and in the evidence to him in good faith and in the regular course of his professional practice as a physician.

Appellant contends on this appeal that there was prejudicial error in that: (1) There was improper limitation of cross-examination of Joe Griffin; (2) the prosecutor was permitted to ask the witness Forrer a prejudicial leading question; (3) a mistrial should have been ordered because of the prejudicial question and improper remark of counsel; (4 and 5) there was improper cross-examination of defendant, and (6) an improper hypothetical question was permitted.

1. Griffin had persistently denied that he had suffered an injury to his knee shortly before the alleged narcotic transactions took place, or that he had consulted the defendant about the injury. On further cross-examination, after a recess, he admitted an injury to his knee at the time in question. The defense attorney put this question to Griffin: "You didn't think about that this morning when I asked you a dozen times about it, did you?" Answer: "No, sir." The government attorney objected to arguing with the witness and was sustained by the court. The defense excepted to this ruling. Cross-examination continued to show how the injury occurred and what

treatment was given. The cross-examination appears to have been complete and thorough and not materially obstructed or limited by the above ruling.

2. On direct examination, Patrolman Collier, witness for the prosecution, was asked: "What if anything, did you hear Dr. Stahl say about Joe Griffin promising to pay the balance of $20 a few days later, did you hear that conversation?" The defense objected to suggesting a conversation of which there was no testimony. The court overruled the objection and the defendant excepted. Collier answered: "I don't recall."

■ Defendant claims that by this question the prosecution sought to explain why defendant did not have the $25 on his person on September 9th when arrested, and thus he was prejudiced. However, Police Captain Walker later testified that he heard the doctor say that Griffin was to pay him the $20 balance later and Collier was present at the time of that conversation in defendant's office on September 9th. As the extent to which leading questions may be asked is a matter primarily for the discretion of the trial judge, and the conversation in question was testified to by Captain Walker, it would appear the question did not create any substantial prejudice. United States v. Montgomery, 3 Cir., 126 F.2d 151.

■ 3. On direct examination of Mr. Forrer, United States Bureau of Narcotics inspector, the government attorney asked: "Did you have occasion within the last two years to come to Springfield, Mo., to investigate activities of Dr. Stahl?" Defendant objected and asked to examine the witness out of the presence of the jury. The court permitted the question to be asked, and the government attorney re-phrased it as follows: "Within the last year may I ask you whether or not you have come to Springfield, Mo., and talked with Dr. Stahl with reference to administering the narcotic law?" Defendant objected that that did not tend to prove or disprove any of the allegations of the indictment. The court then asked: "What is your object, to prove intent?" And the government attorney answered: "To show that he was warned." Defendant objected, asked that the jury be discharged and counsel reprimanded for making the statement. The court instructed the jury to disregard the statement and sustained the objection.

In view of the whole record it does not appear that the question and alleged misconduct of the prosecuting attorney could have created a prejudice in the minds of the jury that was not successfully eradicated by the timely action of the trial judge in sustaining the objection to the question and instructing the jury to disregard the statement of the prosecuting attorney. Goldstein v. United States, 8 Cir., 63 F.2d 609; Bogy v. United States, 6 Cir., 96 F.2d 734, 741.

■ 4 and 5. The defendant was asked whether he was familiar with the laws and regulations relative to the use of narcotics. Objection to the question was overruled. He answered that he felt sufficiently informed on them to practice medicine. He was then asked whether the law did not require that he, as a licensed physician, dispense narcotics only on a written order. Defendant objected that the statute specifically excepts a physician and the objection was sustained. Appellant complains that this question got the idea to the jury that the doctor could dispense or administer narcotics to a patient only with a written form and was beyond the range of direct examination.

No prejudice could have resulted from this question because the court's instruction to the jury correctly stated the law which excepts a physician from the requirement of dispensing only on a written order. Furthermore, the statement in the objection of the attorney for the defense, together with the court's ruling sustaining the objection, corrected any wrong impression.

■■ Defendant was asked whether his giving Griffin 91 quarter-grains of morphine on the 9th was his exclusive way of treating patients of that type. Over objection, the court allowed the question to be answered on the question of good faith. Defendant answered that that was the first time he had treated tuberculosis in exactly that way. It appears this question was proper on the issue of good faith. Salerno v. United States, 8 Cir., 61 F.2d 419; Taylor v. United States, 8 Cir., 19 F.2d 813. Defendant was then asked if he was acquainted with Mr. Forrer, narcotic officer, and he replied that he was not. On being asked if he had met him, he admitted meeting him once. Defendant's attorney objected that this was outside the direct examination and the objection was sustained.

Because the court promptly sustained the objection and defendant did not request any instruction to the jury to disregard the question, we find no prejudicial error.

6. A hypothetical question was asked Dr. Vinyard, witness for the defense, on cross-examination, which stated the essential facts of treatment of Griffin as testified to by defendant and questioned whether that was a correct and approved treatment of tuberculosis. The defense objected that defendant was not trying to treat tuberculosis, but merely to relieve pain, and the question calls for an opinion on defendant's good faith—which was the question for the jury.

The government attorney said he did not ask about good faith and the court permitted the witness to answer. The answer was to the effect that witness would not be able to judge that factor; it would have to be left to the doctor's judgment. On further questioning, he testified an addict would need more morphine and the dose of 100 tablet might be unusual, but would be left to the judgment of the doctor. The question was a proper one to ask an expert witness and was within the scope of his direct examination. The answer was not harmful to the defendant and, therefore, there was no error. United States v. Ginsburg, 7 Cir., 96 F.2d 882, certiorari denied, 305 U.S. 620, 59 S.Ct. 81, 83 L.Ed. 396.

Affirmed.