Everett L. **PARKER**, Jr., Defendant, Appellant,

v.

**UNITED STATES of America,**
Appellee.

**PERMA–HOME CORPORATION,**
Defendant, Appellant,

v.

**UNITED STATES of America,**
Appellee.

Victor **LEAVITT**, Defendant, Appellant,

v.

**UNITED STATES of America,**
Appellee.

**Nos. 6833–6835.**

United States Court of Appeals
First Circuit.

May 22, 1967.

Rehearing Denied June 7, 1967.

Charles M. Burnim, Boston, Mass., with whom F. Lee Bailey, Boston, Mass., was on brief, for appellant in No. 6833.

Manuel Katz, Boston, Mass., with whom Paul T. Smith, Boston, Mass., was on brief, for appellants in Nos. 6834 and 6835.

Albert F. Cullen, Jr., Asst. U. S. Atty., with whom Paul F. Markham, U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Defendants, Perma-Home Corporation, Leavitt and Parker, together with one Conboy, were indicted for knowingly submitting a false F.H.A. loan application to the National Shawmut Bank of Boston for the purpose of obtaining an F.H.A. loan from the bank.[1] Perma-Home, a Massachusetts corporation with a place of business in the City of Lynn, sells home improvements so-called, i. e., roofing, siding, etc. Leavitt, its president, is actively engaged in the day to day operations of this business. Parker is a salesman for this company with authority to sign contracts and related documents on its behalf and Conboy was a customer of Perma-Home who, together with his wife, signed the F.H.A. application in question.

The case was tried to a jury. After the government had put in its case, defendants moved for judgments of acquittal under Fed.R.Crim.P. 29(a) on the ground that the evidence was insufficient to sustain a conviction. The trial court reserved decision on these motions. Thereupon Conboy and his wife took the witness stand and gave their version of the circumstances surrounding the signing of the F.H.A. application. Their testimony tended to exculpate Conboy, but implicated Parker. Quite understandably, Parker then took the stand in his own defense.[2] Neither Perma-Home nor Leavitt offered any evidence in their own behalf. At this point the defendants rested and renewed their motions for judgments of acquittal, but the trial court again reserved decision and sub-

---

1. The statute, 18 U.S.C. § 1010, under which this one count indictment was brought, reads in pertinent part as follows:

"Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Hous- ing Administration for insurance, * * * or for the purpose of influencing in any way the action of such Administration, makes, passes, utters, or publishes any statement, knowing the same to be false * * * shall be fined not more than $5,000 or imprisoned not more than two years, or both."

2. For the most part, his testimony tended to rebut and impeach that of Conboy.

mitted the case to the jury. The jury returned verdicts acquitting Conboy, but finding Perma-Home, Leavitt and Parker guilty as charged. The three last named defendants appealed. Their principal contention is that in passing on these motions the trial court was restricted to the government's evidence at the time it rested; that at that time the evidence was not sufficient to sustain a conviction and therefore the trial court erred in not granting these motions.[3] Obviously, if the evidence at that time is sufficient to sustain a conviction, we need not consider the question of whether the trial court was so restricted. Accordingly, we turn to an examination of the evidence produced by the government.

On May 22, 1963, Parker sold certain home improvements to the Conboys on their residence in Spofford, New Hampshire. In order to formalize the deal he had the Conboys sign a Perma-Home contract for $1,800, of which $1,000 was for certain home improvements, the balance to be used to pay Conboy's indebtedness to a company known as Keene Finance Corporation. This contract was to be financed by Security Acceptance Corporation (S.A.C.). In addition to the contract, Parker had the Conboys sign certain other documents which were necessary for the financing of the S.A.C. loan. Among these was a promissory note and also a power of attorney under which S.A.C. could secure payment of the note by a mortgage on the Conboy's home. At some undetermined time S.A.C. exercised this power and took the mortgage. Parker also elicited certain information from the Conboys that was necessary for the loan application. This included such information as outstanding bills and credit references. He wrote all this down on a yellow Perma-Home form. Parker listed "Whatever debts the Conboys told me they owed." The only outstanding Conboy obligation listed was a debt owing to Keene Finance Corporation.[4]

The next day Parker telephoned this credit information into Perma-Home's office where it was recorded and a folder made up for this job. Later, Parker delivered all the documents to the Perma-Home office where they were filed in the Conboy folder. S.A.C. accepted the loan and Leavitt signed and sent a Perma-Home check for $800 to the Conboys, who used it to pay off Keene Finance Corporation.

On May 27, 1963, Parker negotiated another contract with the Conboys for $2,950. Perma-Home had no record of this transaction.

This brings us to the transaction which gave rise to this indictment. On June 29, 1963, Parker again sold the Conboys some additional home improvements in the amount of $1,450. In this connection Parker filled out the customary yellow Perma-Home form but did not put any credit information on it. The Conboys also desired to finance this contract and Parker had them sign the

---

**3.** After verdict, the trial court denied all motions for judgment of acquittal whether made before or after verdict.

**4.** In relevant part the yellow sheet contained the following:

"TRADE REFERENCES

| Name and Address of Firm | Orig. Amt. | Bal. | Mo. Pay | Status |
|---|---|---|---|---|
| 1. Keene Finance, ...... Keene, N.H. | 1080— | 800 | 45— | good |
| 2. Coastal Accept. Corp., Keene, N.H. | 416 | no | — | pd. ahead |
| 3. G. M. A. C. ........ Manchester, N.H. car | 1700— | no | — | pd. ahead |
| 4. Safford Gas Co., .... Water St., Keene, N. H." | 400— | no | — | pd. ahead |

FH-1 credit application which is the subject of this indictment. There was testimony by Perma-Home's office manager that in the usual course of business FH-1 applications were prepared at the company office and then signed by the salesman and the home owner.[5] Prior to delivering this application (FH-1 form) to Perma-Home, Parker telephoned the information relative to the sale to his office and asked "them" to get the credit information from the folder on the prior transaction of May 22. On July 1 some one in the Perma-Home office telephoned the loan application for the June 29 contract into the National Shawmut Bank[6] but so far as appears did not mention to the bank the prior S.A.C. loan. Moreover, the bank's Investigation Work Sheet, which contained the information submitted to the bank over the phone, listed only the following three firms under the heading of "all open or recently paid instalment, trade or business accounts": (1) Coastal Acceptance, (2) G. M. A. C. and (3) Safford Gas Company. The recently paid up $800 Keene Finance obligation was not included as a reference.

On July 3, 1963, the bank approved this loan and on August 6 Perma-Home sent the bank a completion certificate, the contract, the security note and the FH-1 credit application. The FH-1 credit application did not mention the prior S.A.C. transaction and no debts whatever were listed on this document.[7] At some time during the pendency of this loan application, the bank became aware of the S.A.C. transaction.[8]

There was testimony that it was the usual practice at Perma-Home to have all the papers prepared for submission to the bank at the same time and that practice was followed in this instance. There was also testimony that it was the usual practice for Leavitt to have all the documents relating to a loan readily available to him when he signed the completion certificate and endorsed the note which in this case were to be sent to Shawmut.

On August 6, 1963, Shawmut issued its check to Perma-Home for $1,450 and submitted the loan to the FHA for insurance—which FHA accepted. The Conboys never made any payments on this loan.[9] This was the state of the evidence when the government rested.

In testing the sufficiency of this evidence on a motion for judgment of acquittal, we must determine whether there is substantial evidence from which a jury might fairly conclude guilt beyond a reasonable doubt. United States v. Conti, 339 F.2d 10 (6th Cir. 1964).[10] In making such a determination we must

5. It is not clear when this FH-1 form was signed or if it was filled in at the time of signing. On direct examination, Conboy testified it might have been filled out when he signed it. On cross-examination he testified it could have been blank. Parker testified that both he and Conboy signed it in blank.

6. There was no evidence as to who called this credit information into the bank.

7. The four trade references listed in note 4, supra were listed in the appropriate place as firms that had extended credit to the Conboys, and in the space provided for the listing of outstanding obligations only the words "No Mortgage" appeared.

8. The assistant office manager of the Installment Loan Department at Shawmut testified that the work sheet containing the information submitted over the phone and used to record the credit investigation, contained a reference to the S.A.C. transaction, among the notations on the reverse side, which said, i.e., "1,800 discussed by Security Acceptance, work financed by security on the old part of home. Our deal on new addition to home." Though he testified on cross-examination that the bank must have been aware of the S.A.C. deal at the time the loan was accepted, he acknowledged on re-direct that he didn't have any idea when this writing was put on the back of the document.

9. FHA reimbursed the bank in accordance with its commitment.

10. But see, Weathers v. United States, 322 F.2d 566, 568 (9th Cir. 1963). See also, Comment, The Motion For Acquittal: A Neglected Safeguard, 70 Yale L.J. 1151, n. 17 (1961).

view the evidence and the inferences that may be reasonably drawn therefrom in the light most favorable to the government. United States v. Conti, supra. Cf. Dirring v. United States, 328 F.2d 512 (1st Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964).

■ From our examination of the evidence presented by the government we think the jury could fairly conclude beyond a reasonable doubt that these three defendants were guilty of knowingly filing an FH-1 application which contained false statements. The evidence introduced by the government was sufficient to show that this application contained a false statement. Nothing at all appeared regarding the outstanding S.A.C. obligation. Furthermore, although S.A.C. took a mortgage on the Conboy home as security for its May 22 loan of $1,800, under the heading in the FH-1 application entitled "List of all obligations" there is the statement "No mortgage." [11]

Perma-Home is a small company. The defendant Leavitt, its president, is very active in the day-to-day operations of the company. Not only is he the key man in this organization, present most of the time in the office, but it is also fair to infer that he knew and had his thumb on what went on in the company. In the instant case the evidence shows that he had knowledge of both the S.A.C. loan to the Conboys of a month earlier and of the S.A.C. mortgage that secured payment of it, signing a check for $800 payable to the Conboys on June 12, at which time all papers on the transaction were in front of him. He also knew that Conboys' June 29 application to a different lender for an F.H.A. loan involved the matter of their credit. After the home improvements involved in this case were completed, it was Leavitt who signed the completion certificate and note. It is to be borne in mind that in many cases, of which this one is an obvious example, whether or not Perma-Home is to be paid for the work which, by hypothesis, has already been completed depends upon the success of the loan application.

As was the usual practice, all the papers pertaining to the Conboy deal were filed in a separate folder in the customer's name. The office manager testified that it was also the usual practice for Leavitt to have the entire file with reference to the transaction in front of or readily available to him when a transaction reached the point of signing the completion certificate. There is no evidence in this case that there was any departure from this practice. On the same day that he signed the completion certificate and note, these, together with the contract and credit application were forwarded to the bank.

We think that under all the circumstances the jury could have reasonably inferred that Leavitt examined the Conboy folder in conjunction with signing the completion certificate which was essential in order for Perma-Home to be paid by the bank and in doing so noticed or knew of the contents of the FH-1 form. Also, in this folder was at least one other paper—the company's own credit information sheet which should have but did not contain any credit information on the Conboys. Such an omission was unusual. Nor was there any salesman's copy of the credit sheet in the folder— none having been written up for this transaction. This was also unusual. From these unusual credit omissions and Leavitt's knowledge of the recent S.A.C. deal with the Conboys, the jury also could have reasonably inferred that he knew the FH-1 credit application was false. Yet despite this, he allowed this application, together with the other pertinent papers in the file, to be sent to the bank and ultimately to F.H.A. Although Leavitt himself did not sign the FH-1 ap-

11. See footnote 7.

plication, the jury was warranted in finding that he affirmatively participated in passing the false statement contained therein to F.H.A.

■ There is no doubt that Parker also knew about the prior S.A.C. loan and mortgage. As the office manager for Perma-Home testified, the FH-1 application was prepared in the Perma-Home office in the usual course of business and later signed by the borrower and the salesman. From this the jury could reasonably infer that at the time Parker signed this application it was already filled out. In determining whether Perma-Home had the requisite knowledge, it is necessary only to show that its corporate officers, agents or employees had knowledge. Thus, Leavitt's as well as Parker's knowledge of the false statements in the FH-1 credit application can be imputed to the co-defendant corporation.

The evidence also shows that in telephoning in the loan application to Shawmut on July 1, 1963, the Perma-Home office did not mention either the prior S.A.C. loan, the S.A.C. mortgage or the recently paid up Keene Finance obligation, although they knew of them. Significantly, part of the proceeds of the S.A.C. loan were used to pay off the Keene Finance obligation. These two transactions were linked together. Although this Keene Finance obligation was subsequently listed on the FH-1 application, by that time Shawmut had already approved the loan. From this the jury could have reasonably inferred that Perma-Home neglected to mention the Keene obligation because it feared that an investigation of this would lead to discovery of the S.A.C. obligation. This inference in turn would support the conclusion that the non-disclosure of the latter was intentional.

All other points raised have been considered and found to be without substance.

Affirmed.