**John Phillips McCLARD, Carroll Franklin Simmons, and Verlon Hershel Ussery, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 18792.**

United States Court of Appeals Eighth Circuit.

Dec. 4, 1967.

Rehearing Denied Jan. 8, 1968.

Gladys M. Wied, of Milham & Wied, Benton, Ark., for appellants and filed brief. Appellants McClard and Ussery filed supplemental brief.

William F. Sherman, Asst. U. S. Atty., Little Rock, Ark., for appellee; W. H. McClellan, U. S. Atty. for Eastern Dist. of Arkansas, Little Rock, Ark., was with him on the brief.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

Appellants, John Phillips McClard, Carroll Franklin Simmons and Verlon Hershel Ussery, appeal from a conviction entered by the United States District Court for the Eastern District of Arkansas for violating Title 18 U.S.C. § 2113 by entering a bank, the deposits of which are insured by the Federal Deposit Insurance Corporation, at Ola, Arkansas, with intent to commit larceny. Judgment was based on a jury verdict of guilty to a one-count indictment on all

appellants. The Court sentenced Mc-Clard and Ussery to a commitment of four years, and Simmons to three years.

Appellants challenge the sufficiency of the evidence, the admission of evidence of a boot worn by Simmons and boot prints taken from the floor of an insurance office that was located in the same building housing the bank, the admission of evidence concerning a pistol found on the front seat of a pickup truck that Ussery was occupying when he was arrested, and the Government's use of alleged leading questions in the interrogation of witnesses.

█ The appellants did not testify, as is their privilege, and did not offer any evidence in their own defense. Thus the Government's evidence stands uncontroverted except as to any discrepancies that might appear in the testimony of the eyewitnesses to the incriminating actions of the appellants and other matters relevant to the case. In a criminal case where there has been a conviction resulting from a jury verdict of guilty, the appellate court must take that view of the evidence that is most favorable to supporting the jury verdict and must accept as established all reasonable inferences that tend to support the action of the jury. Any conflicts in the evidence are resolved in favor of the jury verdict. Taylor v. State of Mississippi, 319 U.S. 583, 585–586, 63 S.Ct. 1200, 87 L.Ed. 1600 (1943); Koolish v. United States, 340 F.2d 513, 519 (8 Cir. 1965), cert. den. 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); Smith v. United States, 331 F.2d 265, 278 (8 Cir. 1964), cert. den. 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); Koop v. United States, 296 F.2d 53 (8 Cir. 1961).

The record discloses that on January 22, 1967 between the approximate hours of 1:00 a. m. and 3:00 a. m., some person or persons entered the Ola, Arkansas branch of the First State Bank of Plainview, Arkansas, by prying open the front door of the bank. The front door had been jimmied and there were marks on the doorjamb indicating that some type of tool had been used to force open that

door. A combination on the vault door of the bank had been hammered off, the outside braces to the door's locking mechanism had been loosened and the handle on the door that opened the lock had been broken. Several tellers' drawers had been removed from their receptacles and left on the floor of the bank, and several desk drawers were also removed and the contents "rifled" in a search for items of value. Apparently nothing was taken and the intruders left empty-handed. In addition, they left a large screwdriver, a hatchet and a light sledge hammer, together with a tire tool that looked like and probably served the purpose of a crowbar.

The bank was located at the corner of the intersection of Highway 10 and Main Street. An insurance office was located in the rear of the building that housed the bank, but this was not a part of the bank's operation. A connecting interior door between the bank and the insurance agency was so constructed that the door could be opened from the bank side at any time, but was locked from the insurance agency area and could only be opened from the insurance agency side with a key. The two outside doors to the insurance agency could be opened from the inside when locked, and were used by the bank's custodian as his sole means of exit when he would leave after finishing his chores. He did not have a key to the bank premises.

When officials entered the bank at 10:00 a. m. of the same morning of the attempted burglary boot prints were noticed in the insurance agency part of the building, the marks being visible because water had apparently been taken from a refrigerator in the insurance agency room and some of it spilled on the floor. The intruder wearing the boots made several well defined boot prints on the insurance agency floor—eleven boot prints were visible, four of which were processed. There was no question that the bank had been entered and a burglary attempted.

The evidence connecting or implicating the appellants with the attempted bur-glary is as follows: The appellants were seen by five witnesses during a period of approximately 12:00 o'clock midnight to around 3:00 a. m. on the night of the burglary. When first observed, the appellants were riding in a dark green or black old model Chevrolet pickup truck with red cattle sideboards that was passing up and down the street on which the bank was located. Later the pickup drove up and parked in front of the bank, and the occupants first came around to the bank windows and "fooled around there a little bit and went around to the door"; two of the occupants of the pickup truck were identified by witness Glenn Floyd, who had stopped his car close to the pickup, mistakenly thinking that the occupants were some coon hunting friends of his, and he was thus placed in a position to view all of the occupants, except the driver. Witness Eddie Joe Lawrence noticed the pickup twice cruising up and down the street on which the bank was located. Witness Floyd noticed the pickup parked in front of the bank after he had previously seen it, thinking that he knew the parties. When he saw this pickup parked in front of the bank around 1:30 to 2:00 a.m. and noticed them "fooling around the window" and also "messing with the door" he left to find the deputy sheriff located in Ola, but he was unable to arouse him. Floyd came back to town and talked with some other boys in the vicinity of the bank, parking his pickup between the Dairy Queen and the Conoco station which were across the street and located a short distance from the bank. He noticed the individuals in the old model Chevrolet pickup truck with red sideboards again come back to the area of the bank where one of them got out at the bank and went across over between the D-X Station and the cafe. The other two drove the pickup around the block and parked close to the bank. Floyd again went to get the law and was successful in wakening him, after which they both proceeded back to the bank area in the deputy sheriff's car.

When the deputy first came to the scene he drove by the pickup that was

parked about fifty steps from the bank and saw that it was empty. After driving behind the cafe and the post office he saw three persons running from the bank area toward the filling station. Floyd stayed in the deputy's car, while the deputy jumped out with a shotgun and gave pursuit to three individuals running across the street. He commanded them to stop but ceased immediate pursuit when he heard a shot. He turned around and saw one of them running back toward the intersection and the others in another direction when he attempted to stop them by firing his gun in the air.

The deputy then went back to the parked pickup where he found Ussery on the front seat. The deputy ordered him out of the pickup, placed him under arrest and retrieved a .38 snub-nosed revolver lying on the front seat formerly occupied by Ussery. This gun was loaded and one chamber had been fired.

McClard and Simmons were arrested that same morning after daylight when they were together on Highway 7, about one and one-half miles from Ola. They were armed with a .357 magnum and a .22 pistol. The appellants were taken to separate jails and the FBI was notified. The FBI agent arrived that morning, inspected the bank and made imprints of the boot prints that were found in the insurance agency area. Simmons was taken to the Russellville jail where the sheriff attempted to interrogate him, but after being advised of his rights he refused to make a statement, and the sheriff that night took his boots to use as evidence. The Government submitted evidence showing that the boot prints found in the insurance agency area were of the same size, design and had the same wear characteristics as the right boot of Simmons. The sheriff also testified that the license on the old model Chevrolet pickup was fictitious.

We, therefore, have a situation presented where the three appellants all armed with loaded pistols were driving around the area of the bank in a pickup truck bearing a fictitious license plate in the early hours of the morning, were seen coming from the pickup to the immediate area of the bank "fooling" around the outside windows and "messing" around the front door that later was shown to have been jimmied. These individuals were later in the same area of the bank and when accosted by the deputy sheriff all fled, which is an indication of guilt. They were apprehended, Ussery immediately, apparently hiding in the pickup truck with a loaded pistol, and the other two after daylight that same morning. The boot prints of Simmons were shown to fit the size, design and wear characteristics of the boot prints found in the insurance agency office, which area is easily accessible from the interior of the bank and allows an undisturbed passage to the outside by use of the insurance agency doors which were locked to the outside but not to the interior.

The Government submitted its case on the theory that at least Simmons had entered the bank and tried to burglarize it, and he was either accompanied by Ussery and McClard, or McClard and Ussery were guilty as principals by aiding and abetting Simmons under Title 18, U.S.C. § 2.[1]

▮▮ The evidence, both direct and circumstantial, strongly indicates that appellants were guilty of an attempt to burglarize the bank at Ola. The jury is the judge of the credibility of the witnesses and of the factual issues connecting the appellants with the undenied attempted burglarization of the bank. In reviewing a judgment entered upon a verdict of guilty by the jury we must view the evidence in the most favorable light tending to support the convictions,

---

1. "§ 2 Principals
   "(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.

"(b) Whoever causes an act to be done, which if directly performed by him would be an offense against the United States, is also a principal and punishable as such."

including all inferences which may be reasonably drawn in support of the jury's conclusion. (Koop v. United States, 296 F.2d 53, 54 (8 Cir. 1961).)

◼ The evidence strongly singles out the appellants as the perpetrators of this offense, and their conduct in fleeing from the law is indicative of guilt. They were all in the bank area and Simmons' boot print places him in the insurance agency. They all appeared to be engaged in an attempt to burglarize the bank. No other evidence was introduced or received at the trial to explain their actions, and their actions standing alone with proof of forced entry into the bank were sufficient for the jury to find them guilty beyond a reasonable doubt.

◼ The boots worn by Simmons at the time of his arrest and the bootprints processed from the insurance area were clearly admissible. Simmons contends some violation of his constitutional rights and also that no foundation was laid for the admission of this evidence. The relevancy of the bootprints is obvious. Simmons was seen near the bank prior to the offense charged and was no doubt one of the men seen running from the bank at the time the deputy sheriff was investigating the suspicious conduct of Simmons and his companions. When Simmons was apprehended hours later, about one and one-half miles from town, he was wearing the boots which made the boot tracks or prints in the insurance agency area. This evidence under the circumstances places Simmons in the bank. It is an accepted rule of evidence that, for the purpose of identifying the accused as the guilty party, evidence of the correspondence of the accused's footwear or tracks to prints or tracks found near the scene of the crime is admissible. This is similar to fingerprint evidence that is usually admissible for the purpose of identifying the accused as the offender and to connect him with the offense. As noted in 1 Wigmore on Evidence, § 149 (3rd Ed. 1940):

"The presence upon the person or premises of articles, fragments, stains, tools, or any other resulting circumstance is consistently employed as the basis of an inference that the person did an act with which these circumstances are associated."

Wigmore further notes "Their relevancy is so patent that no occasion is given for rulings of law; * * *." See Downey v. United States, 263 F.2d 552 (10 Cir. 1959); Patterson v. United States, 62 F.2d 968 (10 Cir. 1933); Sheppard v. State, 239 Ark. 785, 394 S.W.2d 624 (1965); Anno. 35 A.L.R.2d 856 (1954).

◼◼ The boots may be taken from a suspect as an incident to a lawful arrest for an investigation of the crime and the connection of the accused with the commission of the crime. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1946). This is not testimonial evidence and does not come within the protection of the Fifth Amendment against self-incrimination. Clothes, features and fingerprints, including imprinting of a suspect's foot in a plaster cast for the purpose of identification are all permissible steps in a proper investigation of an offense and the accused's connection therewith. See 8 Wigmore on Evidence, § 2265, (McNaughton rev. 1961).

The boot is only an identifying piece of apparel worn by the accused and is far removed from any Fifth Amendment protection against self-incrimination. Even identifying physical characteristics are permitted in evidence when relevant. As reasoned by Justice Brennan in Gilbert v. State of California, 388 U.S. 263, at 266; 87 S.Ct. 1951, at 1953, 18 L.Ed.2d 1178 (1967):

"The privilege reaches only compulsion of 'an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers,' and not 'compulsion which makes a suspect or accused the source of "real or physical evidence" * * *' Schmerber v. State of California, 384 U.S. 757, 763–764, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908. One's voice and handwriting are, of course, means of com-

munication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the privilege. A mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection. [United States v. Wade, supra, 388 U.S. 218, 222–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149.]"

Appellants next question the seizure of Ussery's .38 snub-nosed revolver that was seized when Ussery was placed under arrest. The revolver appeared in plain view lying on the front seat of the pickup truck at a place where it had previously been concealed by Ussery's body. One shot had been fired from this gun and its seizure and admission into evidence were permissible and relevant to the offense charged. It is common knowledge that burglars and those intent on predatory practices often carry or have at their command loaded guns. These concealed guns are often associated with and mostly used to perpetrate criminal acts. This is but another significant incident in the overall investigation of the attempted burglary of the bank. The arrest of Ussery was legal both for investigation of attempted burglary and for carrying a concealed weapon.

The legality of an arrest is determined by state law in the absence of an applicable federal statute. United States v. Di Re, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1949). Under Harris v. United States, supra, the revolver could be seized as an incident to the arrest or even as an instrument of the crime itself of carrying concealed weapons. As discussed in the Arkansas case of Williams v. State, 237 Ark. 569, 375 S.W.2d 375 (1964), the seizure of articles that were seen by officers in a truck and seized is permissible as a reasonable search and is not violative of the Fourth Amendment guarantees against unreasonable searches and seizures. Here the sight of Ussery's pistol on the front seat under the circumstances of this case afforded the deputy sheriff probable cause to believe that a crime had been or was being committed in his presence. The arrest of Ussery and the seizure of his pistol without a warrant were proper and legal, as was the subsequent admission into evidence of the testimony concerning the pistol. Busby v. United States, 296 F.2d 328 (9 Cir. 1961), cert. denied 369 U.S. 876, 82 S.Ct. 1147, 8 L.Ed.2d 278 (1962).

Some leading questions were asked by counsel for the Government during the trial of this case, but whenever objection was properly made the objection was sustained and Government counsel admonished against asking leading questions. Oftimes leading questions are asked on preliminary and collateral matters to expedite the trial. In any event the control of leading questions is a matter left to the discretion of the trial judge. Absent an abuse of this discretion, there can be no prejudicial error and the appellants in this case have not shown that any of the rulings of the experienced trial judge were erroneous, let alone prejudicial. Stahl v. United States, 144 F.2d 909 (8 Cir. 1944). 3 Wigmore on Evidence, § 770 (3rd Ed. 1940).

Appellants had a fair trial and the issues were properly submitted to and explained to the jury in the charge of the trial judge. The evidence, both direct and circumstantial, made a clearly submissible case upon which the jury was warranted in rendering a verdict of guilty. No prejudicial error has been shown to have occurred in the trial of this case. We think the verdict of the jury should stand, and the judgment is affirmed.

LAY, Circuit Judge (dissenting):

I cannot concur in the majority opinion. I do not believe that any man should be convicted of any crime when the government proves only suspicion and circumstances and totally fails to properly prove identification of those persons charged.

With all due respect to the majority's experienced judgment, the record fails to show in any way the essential identification of the three defendants with the crime charged. Individual identification of each of the three defendants is necessary, but totally lacking. Mass identity is even obscured by the government's proof. The law asks very little in requiring the government to *properly* prove a case when the ultimate consequence may be to deprive a man of his life or liberty. Courts should not be willing to allow convictions where inferences are derived from facts only suspicioned and not proved. Regardless how zealous we are to have good communities and proper criminal law enforcement, we have contracted with the rule of law that all men are presumed to be innocent until *proven* by competent evidence to be otherwise. The basic rights of all free men depend upon this principle. Each of the defendants has pleaded not guilty. Each of them must be proven to have participated in the crime charged. Unexplained presence in the vicinity of a burglarized bank is not enough.

The majority opinion reflects that the appellants were identified by five witnesses from midnight to around 3:00 a. m. the night of the burglary. I respectfully submit the record not only does not justify this conclusion but totally absent is any competent identification whatsoever. Witnesses called by the state and their evidence are as follows:

EDDIE JOE LAWRENCE. Age 18. He was sitting at a DX station across the street from the bank at approximately 1:00 a. m. with four other boys. He stated he saw a dark Chevrolet pickup "with red sideboards" pass up and down the main street of Ola. *At no time did he identify the appellants or even state how many persons, if more than one, were in the pickup.*

EDWARD ISOM. He was the Mayor of Ola, who was returning from a night of fox hunting at approximately 1:10 a. m. He saw an old pickup with "red sideboards" at the Y intersection of highways 10 and 7, approximately five blocks from the bank. *At no time did he identify the people in the pickup or even state how many persons, if more than one, were there. At no time did he identify the appellants.*

DR. JAMES PENNINGTON. Coming home from the hospital at 1:00 a. m. on the same night of the burglary he saw an old pickup with red sideboards. He said he saw it a distance of 100 yards in his rear view mirror. Later he saw the lights of "some kind of vehicle" near the bank when he was several blocks away. *Obviously, at no time did he identify the appellants.*

WILLIAM C. BAKER. Age 18. He was sitting at the Esso station across the street near the bank. He testified that he noticed a pickup truck, dark green or black, go by the main street twice at about 12:30 or 1:00 a. m. *At no time did he identify the appellants.*

HERBERT M. LAWRENCE. Age 17. He was at the DX station with Eddie Joe Lawrence at approximately 12:30 or 1:00 a. m. He saw a dark pickup twice that night. It had sideboards but he did not notice what color. He said he also saw Ed Isom's pickup. *At no time did he identify the appellants.*

OTT ROSE. He was the Deputy Sheriff. He was aroused by the witness Floyd around 2:00 a. m. and drove downtown. He shined his lights between the DX station and the cafe across the street from the bank. He claims to have heard a shot while pursuing three *unknown* persons. After this chase he returned to a parked pickup and upon opening the door discovered the appellant Ussery lying down inside. There was a gun on the seat. Rose then arrested Ussery. The Deputy Sheriff did not examine the gun at that time to see whether it had been fired. The next day the gun was examined and one chamber was empty. At daybreak he discovered appellants McClard and Simmons one and one-half miles outside of town on the highway. It was shown that they both had possession of loaded guns. *The first time Rose identified any of the appellants was up-*

*on arrest.* There is no evidence that he recognized them as the ones being chased. *This leaves only one witness upon whom the state must rest its case of identification.*

GLENN FLOYD. At approximately 12:30 or 1:00 a. m. he came into town to look for Dr. Pennington. He saw a dark green pickup parked at the car wash with its hood up. He thought it was some of his "coon hunting buddies." He approached the pickup and observed three persons in it. He could only identify two of them at the trial, and in this regard the following is what the record reflects to be the government's proof of identity:

"Q. Did you see who was inside?

"A. I seen two of the fellows good, but the other one I didn't see real good, I saw him, but I didn't see him real good.

"Q. Could you identify them?

"A. Yes, sir.

"Q. Could you identify them now, in the Courtroom?

"A. Yes, sir.

"Q. Will you do so?

"A. The two guys sitting right there, the big one was setting on the outside and the other in the middle.

"Q. Which one was in the middle?

"A. The one on the right.

"Q. You couldn't see who was driving?

"A. No, sir, I didn't get a good look at him."

From this testimony we can only assume that the witness identified two of three defendants as occupying the pickup truck. It was either Ussery and McClard, or Ussery and Simmons, or perhaps it was McClard and Simmons.

In oral argument the government admitted it had failed to properly identify the two persons pointed out by Floyd in the courtroom as being seen at 12:30 in a pickup parked at a car wash. However, the government suggested the two identified were McClard and Simmons. The government states that appellants' counsel, Mrs. Weid, implied as much in oral argument. I know of no rule which allows counsel for the parties to even stipulate to incriminating facts on appeal which are otherwise omitted in proof below. If further appeal is taken, or post conviction proceedings are instituted, what record is available of such oral admissions? No authority is offered to show the right of counsel to stipulate to facts in a case where the evidence might otherwise be insufficient to incriminate or convict the accused. The record must be properly presented. We do not sit as "citadels of technicality" when we require proper identifications in criminal cases. Due process demands it! When multiple parties are tried together, partial identification cannot convict all defendants. To allow this suggests that a joint indictment of co-defendants permits conviction of both upon proof of the guilt of only one. See Butler v. United States, 317 F.2d 249, 254, 6 A.L.R. 3d 582 (8 Cir. 1963), where we said:

"The authorities dealing with the general subject of identification of the accused, and particularly with the quantum and quality of proof required to establish this element of a criminal case, uniformly hold that proof of *the identity of the person who committed the offense is essential to a conviction.*" (Emphasis ours.)

See also Dawes v. United States, 177 F.2d 255 (6 Cir. 1949); Thompson v. State, 115 Ga.App. 28, 153 S.E.2d 632, 633 (1967), and cases collected in 23 C.J.S. Criminal Law § 920, p. 643.[1]

---

1. In Alexander v. State, 164 Tex.Cr.R. 663, 302 S.W.2d 414 (1957), a woman who lived in a second story apartment over a drug store stated that during the afternoon of August 5 she saw a 1956 Chevrolet convertible drive up to the drug store and the appellant and another man

and a woman go inside. The next morning at 1:30 a. m. she identified the same 1956 Chevrolet being driven in a "suspicious" manner in front of the drug store. She saw the appellant get out of the car, walk over to the door of the drug store and heard the door rattle. Later

Mr. Floyd stated that at approximately 1:30 to 2:00 a. m. he saw two persons get out from the same pickup he observed earlier. *He could not identify the persons who got out.* They were in front of the bank. They first "fooled around a window" of the bank. They then came around to the bank door and then according to him:

"A. I couldn't tell what they were doing, just messing with the door.

"Q. Messing with the door?

"A. Yes.

\* \* \* \* \* \*

"Q. Could you tell, Mr. Floyd, whether they were touching the door?

"A. I couldn't tell that; they were just at the door fooling around, you know.

"Q. How far away were you?

"A. I was a half a block, I guess, something like that."

They then drove away in the pickup. Floyd stated he waited until an hour or so, supposedly to call Dr. Pennington, and then this same pickup drove up and one unidentified person got out and went between the DX station and the cafe. These buildings are both across the street from the bank. The pickup went around the block and then dropped off another person. It was at this time that Floyd went to get the Deputy Sheriff. When they came back they turned their headlights on two persons between the DX station and the cafe. Floyd did not hear a gun go off. The Deputy Sheriff said he shot his and heard another. After the chase, they went back to the parked pickup and found Ussery lying down in the front seat.

I submit the above constitutes a complete summary of the total evidence on identification of the appellants prior to their arrests.

If we assume Floyd made a proper identification of McClard and Simmons earlier in the evening at the car wash, the fact remains he did not identify the third person driving. This was approximately 12:30. (It is an interesting observation that Floyd confused this pickup with one owned by some fellow coon hunters. He drove a pickup. The Mayor had one. There were several in the area).

Defendants may well be guilty. My complaint is that the evidence offered did not prove it. It is far better that the guilty go free than to condone conviction of any man on suspicion alone. I think it is important to consider the evidence on the basis of the proven individual participation in the crime alleged:

McCLARD. The government conceded in oral argument that the only evidence of guilt of McClard is that he was found with Simmons the next day with a loaded gun. There is no evidence McClard was near the bank on the night in question. Assuming Simmons was proven guilty by competent evidence, is the presence with him of McClard the following day sufficient to convict McClard? No commentary is necessary to condemn "guilt by association." It is not a rule of law recognized under American justice. The law is that, "In order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." See Learned Hand, J., in United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938), as cited with approval by

the car drove away with two men and a woman in it. On cross examination:

" \* \* \* [S]he was unable to say whether there were two men and one woman or two women and one man in the automobile that night, 'all I could see was three persons,' that she could not tell whether any of the persons was wearing glasses, that the man who crossed the street to the drug store 'looked like' the appellant but that she could not see well enough 'to state positively who any of those people were,' that she could not positively identify the appellant 'as being there,' that she did not know under all the circumstances whether the appellant 'was there on that occasion or not.' " 302 S.W.2d at 415–416.

The identification was held insufficient.

the Supreme Court in Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). See also Diaz-Rosendo v. United States, 364 F.2d 941 (9 Cir. 1966). The latter case, a narcotics smuggling case, also remonstrates that, "Guilt cannot be established by mere association." 364 F.2d at 944. See United States v. Di Re, 332 U.S. 581 at 593, 68 S.Ct. 222, 92 L.Ed. 210; United States v. Garguilo, 310 F.2d 249, 253–254 (2 Cir. 1962).[2]

Notwithstanding the prejudice to the jury, the possession by McClard and Simmons of guns, hardly tends to prove that they committed burglary the night before.[3] Cf. Moody v. United States, 376 F.2d 525 (9 Cir. 1967). Assume the witness Floyd made proper identification, and McClard was seen with Simmons parked in the pickup at the car wash about 12:30 a. m. Later that morning two unidentified men were seen getting out and back into the same pickup near the bank. If we infer, which we must, that McClard was one of the two, do we not have to infer he assisted in the break-in? *Is this not an inference upon an inference?* We cannot infer from a probatice fact not proven.[4] Again, one hour or so later three unidentified men were seen near the DX station and cafe and Post Office by the Deputy Sheriff. Floyd saw only two. Again through the processes of inductive reasoning, we are asked to conclude that McClard was one of those men. But what

evidence is there that he assisted anyone in burglarizing the bank? All these factors make one suspicious of McClard. But a criminal conviction cannot rest even upon probability let alone suspicion and speculation.

USSERY. He was found lying down in the pickup which earlier was allegedly occupied by McClard and Simmons and a third person. Is it a reasonable inference that he was that third person? If we assume he was, where does this lead to? Can we further assume he was in the pickup when the two unidentified men got out in front of the bank? What if he were? What did the two men do? What did he do? It was lighted up all around the bank. Several boys were together across the street. No tools were seen or described in the hands of the two near the bank. They were "messing around" by the door and window. Whenever this may have been, they were not observed in any way touching the door. At the same time several boys were "fooling around" near the DX or Dairy Queen. What does that prove? True, the bank was burglarized, but assuredly not at this time. The men got back into the pickup and left. They did not enter the bank. Does mere presence of two unidentified men in front of the bank establish guilt of this defendant?

See Coleman v. United States, 113 U.S. App.D.C. 144, 306 F.2d 751 (1962). There, the defendant was convicted along with a co-defendant of housebreaking as

2. Judge Friendly states at 310 F.2d 254: "Never were the jurors told in plain words that mere presence and guilty knowledge on the part of Macchia would not suffice unless they were also convinced beyond a reasonable doubt that Macchia was doing something to forward the crime—that he was a participant rather than merely a knowing spectator."
The case was remanded for a new trial of Macchia.

3. In Wood v. United States, 342 F.2d 708 (8 Cir. 1965), a conviction of larceny from interstate carrier was reversed for insufficiency. Judge Ridge stated in the course of the opinion that, "* * *

it is axiomatic that sufficiency of the evidence in every criminal case, to sustain a conviction, must be judged with respect to proof of the offense actually alleged in the indictment." 342 F.2d 712.

4. "Inferences must be based upon proven facts or facts of which judicial notice must be taken and one inference cannot be based upon another inference. To sustain a finding of fact the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion." Wesson v. United States, 172 F.2d 931, 933 (8 Cir. 1949).

defined in 22 D.C. Code § 1801 (1961). The Circuit Court affirmed conviction of the co-defendant in a separate case, there noting that the evidence was sufficient for that conviction (Britton v. United States, 112 U.S.App.D.C. 207, 301 F.2d 531 (1962)). In the *Coleman* case, however, the conviction was reversed, with the court saying:

'The co-defendant Britton, whose conviction we have affirmed, was shown to have been in the building where the housebreaking occurred, but the evidence failed to bring home to this appellant either that he aided and abetted Britton by acting as 'look-out' or that he participated in any actual breaking or entering of the building, essential elements of the offense charged. By using a police dog to follow a scent appellant was located near the scene, but neither the evidence to that effect, nor other evidence, placed him at any time in the building or established that he had collaborated with Britton in the crime itself.

"The jury were not warranted in finding appellant guilty beyond a reasonable doubt."

As was stated in United States ex rel. Argento v. Jacobs, 176 F.Supp. 877, 883 (N.D.Ohio 1959):

"The mere fact that a person is seen in the vicinity of the commission of a crime is not sufficient evidence of his complicity in said crime."

Ussery was never identified until he was found in the truck. Assuming probable cause for the arrest of Ussery for investigation, this does not prove burglary of the bank. He was found in suspicious circumstances, *which he has no burden to try to explain.* He has no burden to prove that he was not one that was being chased. If we can infer that he was, does this prove guilt? Guilt of what? Contrary to the majority opinion, they were never seen running away from the "area of the bank." But if they were, flight is but the weakest of evidence, unless the facts are known as to the motive of the accused which prompts it. See Vick v. United States, 216 F.2d 228 (5 Cir. 1954), and of course, Hickory v. United States, 160 U.S. 408, 16 S.Ct. 327, 40 L.Ed. 474 (1896); Alberty v. United States, 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896); and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *What makes the evidence more tenuous in the present surroundings is that there is no proof in the present case that any of the three appellants were the ones being chased.* And it is extremely doubtful at the time of the chase that any crime had been committed by anyone. The bank had been under continued observation by the witness Floyd except for a brief period of time and he did not see anyone at any time enter by the front door.

Ussery may have been guilty of other crimes; but he was charged with burglary and the government must prove it. True, he had a gun, he was found in a truck with a fictitious license plate, shortly after three men were being suspiciously pursued for questioning. But what is shown as to his guilt of the crime charged? His association? And if so, with whom—McClard? What proof of association? What did McClard do? Perhaps his alleged association with Simmons? But what proof of association? And if so, what did Simmons do?

SIMMONS. The case relating to Simmons must rely upon the singular proof by the FBI of the comparison of footprints made from tracks in the insurance office and prints taken from Simmons' boots after arrest. There is no doubt of the admissibility of the prints. However, these prints are again the weakest kind of evidence. They do not stand side by side with the identifying characteristics of fingerprints or blood type. The government's testimony reflects only that in the opinion of the FBI agent the bootprints from Simmons' boots are of "the same size and design and had the same wear texture of the

right." Similar tracks of shoes worn by an accused cannot stand alone to substantiate sufficient proof of guilt in a criminal trial.[5]

In this regard, the case of Warren v. State, 52 Tex.Cr.R. 218, 106 S.W. 132, 133 (1907) contains the following analysis:

"It would be a dangerous precedent, however, guilty this appellant may be, for this court to lay down a rule holding that tracks alone, plus a presence within two miles of the scene of a crime, would justify a court in affirming a case. The tracks show that the party making same had on a pair of shoes that had been half soled. The heels of one of the shoes making the tracks was run down and worn off, several tacks were prominent, or several indentations in the tracks appeared to have been made by prominent tacks. These peculiarities are shown to have existed in appellant's shoes. But * * * [i]t is too well known that shoes are frequently half soled, and it is equally well known that tacks are often prominent therein. It is further a commonly known fact that heels of shoes are often run down or worn off.

"These being matters of common notoriety and knowledge * * *. So believing, we reverse this case because the evidence is insufficient to support the verdict." 106 S.W. 133.

See also e. g., Harris v. State, 163 Tex. Cr.R. 519, 294 S.W.2d 123 (1956); State v. Murphy, 356 Mo. 110, 201 S.W.2d 280 (en banc 1947); Ennox v. State, 130 Tex.Cr.R. 328, 94 S.W.2d 473, 475–476 (1936); Harding v. State, 122 Neb. 766, 241 N.W. 526, 527 (1932).

What other proof of guilt is there concerning Simmons? None exists of which I know.

5. The government witness admitted that shoe wear is a good deal like wear and tear on a tire and that he "possibly could not tell" the difference between a bootprint by a similar shoe with those taken from the floor of the insurance company. The government attempted to point out distinguishing marks of wear made from Simmons' boots which correspond to the same marks on the prints. However, cursory examination discloses that the overlay print from Simmons' boot cannot possibly be the same shoe which made the print photographed in Exhibit 26. Examination shows that the back four lugs of the overlay cannot possibly fit on the lift in question. The indistinctiveness of the lift cannot account for a different size boot. The heel print on the overlay of Exhibit 25 hardly fits within any distinctive pattern of the print itself. Any number of heels could fit the same general shape of the print in Exhibit 25. The same could be said of the overlay on Exhibit 23. On Exhibit 23 no attempt is made to explain the obvious heel mark made by a different shoe. One can only surmise it was made by another "burglar" or perhaps an innocent third person. Assuredly, the boots of McClard and Ussery were within similar constructive custody of the government for examination. Exhibit 24 has an overlay upon which the government demonstrates distinguishing characteristics of Simmons' boots on photographs. Such evidence sounds persuasive until examination shows that there can be no consistency or logic to this testimony. The red marks show where voids appear in Simmons' boots and correspond with voids in the print. Of course, this does not always correspond. This is explained by the statement that the marks on the prints are filled in by the blurring characteristics of the fluid used in taking the prints. We are told that where the voids appear on the picture it proves identity, where they do not it is explained by the process in which the prints are lifted. Many of the red marks are obviously traced from the photograph to appear to be of the same size and design, whereas the actual overlay print demonstrates a different pattern. Some of the red marks enlarge the overlay on Exhibit 24, such as the arrow on the second lug from the left to correspond, not with a void on the photograph but with the blurred print. It is true the effect of this testimony and these exhibits are for the finder of fact. But where the only evidence available to convict a man and two alleged associates must rest on such inconclusive proof, this court not only has the prerogative but duty to set the verdict aside.

In summary, it is my opinion that the evidence falls far short of proof that Ussery, McClard or Simmons individually or collectively burglarized the Ola bank. Various burglary tools were found by the authorities inside the bank. Water was allegedly taken in *glass* jars from a refrigerator, yet no fingerprints of any of the accused were offered from the tools or the glass. Only inconclusive bootprints were presented.

It is not the province of this court to weigh the evidence and thereby determine guilt or innocence. Ordinarily, questions of identification of the accused are left to the jury to determine from all the facts and circumstances submitted. However, the courts must exercise their responsibility to review the sufficiency of the government's evidence, when it attempts to weave mere suspicious circumstances into a web of guilt. We do not encroach upon the function of the jury by setting aside convictions premised on speculative inferences. Nor can the fact that there exists more than one speculative inference satisfy the quantum of proof necessary to convict a defendant in a criminal trial.

Since Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), federal courts are no longer required to give separate instructions concerning circumstantial evidence. 348 U.S. at 139–140, 75 S.Ct. 127. The teaching of that case is that the commonly accepted burden of the government where proof is based upon circumstantial evidence is no different from its burden in cases where there is testimonial evidence. Thus, the rule that the burden of the government requires exclusion of every reasonable hypothesis but that of guilt is no longer acceptable. Other circuits have since adopted new standards of weighing circumstantial proof to determine its sufficiency to sustain conviction.[6] Some still adhere to the pre-*Hol-*

---

6. Paraphrasing these rules:

Whether evidence including reasonable inferences is sufficient to warrant a jury to conclude guilt beyond a reasonable doubt. Dirring v. United States, 328 F.2d 512 (1 Cir. 1964); Parker v. United States, 378 F.2d 641, 1 Cir. May 22, 1967.

Whether there exists sufficient and substantial evidence, taking the view most favorable to government, to support the verdict. United States v. Schipani, 362 F.2d 825 (2 Cir. 1966); United States v. Aadal, 368 F.2d 962 (2 Cir. 1966).

Whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt. Also, whether there is substantial evidence, taking the view of it most favorable to the government, to support the verdict. United States v. Giuliano, 263 F.2d 582, 583 (3 Cir. 1959); United States v. Stirone, 311 F.2d 277, 284 (3 Cir. 1962).

Whether the evidence, construed most favorably for the prosecution, was such that a jury might find the defendant guilty beyond a reasonable doubt. United States v. Wallace, 300 F.2d 525, 531 (4 Cir. 1962).

Whether there is sufficient evidence to permit the trier of facts to find the defendants guilty beyond a reasonable doubt. United States v. Luxenberg, 374 F.2d 241 (6 Cir. 1967).

Whether evidence sufficient to convince a jury beyond a reasonable doubt of defendant's guilt. United States v. Atnip, 374 F.2d 720, 723 (7 Cir. 1967).

Whether, viewing the evidence in a light most favorable to the government, there is substantial evidence on each element of the offense from which the jury could find that the accused is guilty beyond a reasonable doubt. Pauldino v. United States, 379 F.2d 170 (10 Cir. 1967).

"Where only circumstantial evidence is involved, it used to be stated that to sustain conviction the proof must negative every hypothesis save that of guilt. But in the *Holland* case in 1954, the Supreme Court said the better rule is simply to instruct properly on reasonable doubt, and expressed the view that the additional instruction is confusing and incorrect. In the case at bar there was on the evidence in the record a reasonable doubt that Hiet took the property; indeed there was no evidence whatsoever that he took it or carried it away. Without any evidence whatever connecting Hiet with the missing property, I think there is necessarily a doubt (more than a reasonable one, I think) that he took it and carried it away. The doubt is not a visceral or moral one; it is a

*land* rule, apparently by distinguishing the *Holland* case as applying only to jury instructions given by the trial court.[7]

In Gregory v. United States, 365 F.2d 203, 205 (8 Cir. 1966), we pointed out that there is no separate rule for circumstantial evidence,[8] and affirmed a conviction on the grounds that substantial evidence tending to prove guilt beyond a reasonable doubt was introduced. It would appear that we have adopted the rule in conformity with the majority of other circuits that where reasonable minds can find substantial evidence on each element of the offense tending to show the accused to be guilty beyond a reasonable doubt, courts should sustain a conviction.

In the present case, taking all of the facts and circumstances together, I do not feel there exists sufficient evidence to sustain a finding of guilt beyond a reasonable doubt of any or all of the defendants.

Perhaps one or all of the defendants are guilty. I do not know. On this record, I can only speculate. If they are guilty, I certainly do not know when these defendants burglarized the bank. Perhaps it was done after Ussery was arrested, by the other two appellants. In any event, it was not proven. Until emotional distrust becomes the substitute for the rule of law, the presumption of innocence of every person shall persist; mere association or group identification shall not be competent evidence of guilt; and the failure of any man to take the witness stand shall not prejudice him in any way.[9] Today many laymen feel these rules offer too great a protection for the guilty. However, it is the tested experience of the law that this constitutes a negligible price exchanged for the protection of the rights of the innocent man everywhere.

I would reverse and remand for a direction of acquittal of each defendant.

doubt upon the record; the lack of essential proof creates the doubt as a legal matter. So the judgment must be reversed." Hiet v. United States, 124 U.S.App.D.C. 313, 365 F.2d 504, 506 (1966).

7. Whether evidence is inconsistent with every reasonable hypothesis of innocence. Thurmond v. United States, 377 F.2d 448 (5 Cir. 1967).
   Whether reasonable minds could find that the evidence excludes every reasonable hypothesis but that of guilt. Thomas v. United States, 369 F.2d 372, 373 (9 Cir. 1966).

8. See also Wood v. United States, 361 F.2d 802 (9 Cir. 1966). However, this court in post-*Holland* cases has at least twice given approval to the old rule, see Sykes v. United States, 312 F.2d 232, 235 (8 Cir. 1963) and the first Wood v. United States, 342 F.2d 708, 713 (8 Cir. 1965).

9. It is sometimes important to recall Mr. Justice Field's admonition:
   " * * * [T]he act [18 U.S.C. § 3481] was framed with a due regard also

to those who might prefer to rely upon the presumption of innocence which the law gives to every one, and not wish to be witnesses. It is not every one who can safely venture on the witness stand, though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would therefore willingly be placed on the witness stand. The statute, in tenderness to the weakness of those who from the causes mentioned might refuse to ask to be a witness, particularly when they may have been in some degree compromised by their association with others, declares that the failure of a defendant in a criminal action to request to be a witness shall not create any presumption against him." Wilson v. United States, 149 U.S. 60, 66, 13 S.Ct. 765, 766, 37 L.Ed. 650.